# United States Court of Appeals
## For the First Circuit

No. 12-1233

KG URBAN ENTERPRISES, LLC,

Plaintiff, Appellant,

v.

DEVAL L. PATRICK, in his official capacity as Governor of the
Commonwealth of Massachusetts; CHAIRMAN AND COMMISSIONERS OF THE
MASSACHUSETTS GAMING COMMISSION, in their official capacities,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

Paul D. Clement, with whom Jeffrey M. Harris, Brian J. Field,
Bancroft PLLC, Kevin M. Considine, Alexander Furey, and Considine
& Furey, LLP were on brief, for appellant.
Kenneth W. Salinger, Assistant Attorney General, with whom
Martha Coakley, Attorney General of Massachusetts, was on brief,
for appellee.
Jeffrey Pokorak, Lorie Graham, and Nicole Friederichs on brief
for Suffolk University Law School's Indian Law and Indigenous
Peoples Clinic, amicus curiae.

August 1, 2012

**LYNCH**, **Chief Judge**.  This appeal raises a constitutional challenge to certain provisions of a 2011 Massachusetts law, "An Act Establishing Expanded Gaming in the Commonwealth" (the Massachusetts Gaming Act), 2011 Mass. Acts ch. 194 (largely codified at Mass. Gen. Laws ch. 23K), which sets procedures and standards for authorizing legalized gaming in the Commonwealth of Massachusetts.

KG Urban Enterprises, LLC, a potential applicant for a gaming license, argues that § 91 of the Act provides unauthorized preferences to Indian tribes and on that basis treats the southeast section of the state differently, and this constitutes a classification on the basis of race in violation of the Equal Protection Clause of the Fourteenth Amendment and is inconsistent with Congressional intent in the federal Indian gaming statute.

We affirm the denial of KG's request for injunctive and declaratory relief as to § 91, reject the remainder of KG's claims, vacate the district court's dismissal of the complaint, and remand for such further proceedings as may be appropriate.

I.

This case involves two statutory schemes, one state and one federal.  The state scheme is the Massachusetts Gaming Act. The federal scheme is the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701-2721, which establishes a cooperative federal-state-

tribal regime for regulating gaming by federally recognized Indian tribes on Indian lands.

A.       The Massachusetts Gaming Act

The Massachusetts Gaming Act was enacted on November 22, 2011. The Act establishes "a Massachusetts gaming commission" (the Commission), which consists of five commissioners, defendants here. Mass. Gen. Laws ch. 23K, § 3(a). The Commission is the principal entity charged with implementing the provisions of the Act, including the licensing scheme at issue.

The Act authorizes gaming through the Commission's issuance of "Category 1" and "Category 2" licenses. A category 2 license, not at issue here, allows the licensee "to operate a gaming establishment with no table games and not more than 1,250 slot machines." Id. § 2. A category 1 license "permits the licensee to operate a gaming establishment with table games and slot machines." Id.

As to category 1 licenses, the Act creates three "regions," regions A, B, and C, corresponding to counties; region A covers the Boston area, B the western portion of the state, and C the southeastern portion of the state. See id. § 19(a). The Commission "may issue not more than 3 category 1 licenses based on the applications and bids submitted to the commission. Not more than 1 license shall be awarded per region." Id.

-3-

While the statute states that "[n]ot more than 1 license shall be awarded per region," the statute appears to contemplate that three category 1 licenses will be awarded in total. The statute specifies the circumstances where a category 1 license is not to be awarded in a region: "if the commission is not convinced that there is an applicant that has both met the eligibility criteria and provided convincing evidence that the applicant will provide value to the region in which the gaming establishment is proposed to be located and to the commonwealth, no gaming license shall be awarded in that region."[1] Id.

This case concerns certain special provisions for category 1 licenses in the southeast region only, which is where the state's only federally recognized Indian tribes are located. We describe the statewide procedures before turning to the special procedures which treat the southeast differently.

1.  The Statewide Procedures

The Commission's solicitation of applications for category 1 licenses is a key initial step in the category 1 licensing process. The Act does not set a deadline by which the

_____

[1] The Chairman of the Commission has stated that the legislation was passed on an underlying economic assumption that "[t]he market can handle three casinos." Arsenault, Studies Back 4 Gaming Sites, Bos. Globe, June 15, 2012, at B1. The Commission recently held a forum to evaluate whether the state can in fact support three category 1 casinos, at which the Chairman stated that the economic "assumptions that were the underpinnings of the law still hold." Id.

Commission must solicit applications for category 1 licenses, nor does the Act establish any timeframe for such solicitation. Rather, the Act provides that "[t]he commission shall issue a request for applications for category 1 and category 2 licenses; provided, however, that the commission shall first issue a request for applications for the category 2 licenses." Id. § 8(a). The Commission is required to set deadlines for the receipt of all such applications, id. § 8(c), and to "prescribe the form of the application," which must require certain detailed information about the entity requesting a license and its proposal, id. § 9(a).

Once the application is reviewed,[2] the Commission is to "identify which communities shall be designated as the surrounding communities of a proposed gaming establishment." Id. § 17(a). The applicant must reach an agreement with the surrounding communities "setting forth the conditions to have a gaming establishment located in proximity to the surrounding communities," id. § 15(9), before the application process may continue, id. § 17(a). The Commission is then to hold a public hearing within the host community of the gaming site. Id. § 17(c).

_____

[2] Upon receiving the application, the Commission is to take a variety of steps in reviewing the application and make a variety of assessments as to an applicant's qualifications, according to requirements enumerated in the statute, which we need not outline here. See Mass. Gen. Laws ch. 23K, §§ 12(a), 12(c), 13(a), 15-16, 18.

Between thirty and ninety days after the hearing, the Commission is to take action on the application: it must either grant a license, deny a license, or extend the period for issuing a decision by up to thirty days.  Id. § 17(e).  Licenses "shall only be issued to applicants who are qualified under the criteria set forth in [the Act], as determined by the commission."  Id. § 19(a).  As said, the Commission may under certain conditions determine that "no gaming license shall be awarded in that region."  Id.  Moreover, the Commission has "full discretion as to whether to issue a license."  Id. § 17(g).  The Act provides that the Commission's decision as to whether to issue a license is not reviewable: "Applicants shall have no legal right or privilege to a gaming license and shall not be entitled to any further review if denied by the commission."  Id.

A license is to be valid for an initial fifteen-year period.  Id. § 19(b).  Further, if a license is granted "no other gaming license shall be issued by the commission in any region during that 15-year period."  Id.  The Commission is to establish license renewal procedures.  Id.  Licenses may not be transferred without majority approval of the Commission.  Id. § 19(c).

2.    Section 91 of the Act

Section 91, which is not codified in Chapter 23K, forms the basis of KG's primary challenge.  2011 Mass. Acts ch. 194, § 91.  Section 91(a) provides that "[n]otwithstanding any general

or special law or rule or regulation to the contrary, the governor may enter into a compact with a federally recognized Indian tribe in the commonwealth." Id. § 91(a). The Commission is, upon request of the Governor, to assist in negotiating the compact. Id. § 91(b). The Governor may "only enter into negotiations under this section with a tribe that has purchased, or entered into an agreement to purchase, a parcel of land for the proposed tribal gaming development and scheduled a vote in the host communities for approval of the proposed tribal gaming development." Id. § 91(c). If a compact is negotiated, it must "be submitted to the general court for approval." Id. § 91(d).

We divide subsection (e), on which KG's equal protection challenge focuses, into its two component clauses, which provide:

> Notwithstanding any general or special law or rule or regulation to the contrary, if a mutually agreed-upon compact has not been negotiated by the governor and Indian tribe or if such compact has not been approved by the general court before July 31, 2012, the commission shall issue a request for applications for a category 1 license in Region C pursuant to chapter 23K of the General Laws not later than October 31, 2012;
>
> provided, however, that if, at any time on or after August 1, 2012, the commission determines that the tribe will not have land taken into trust by the United States Secretary of the Interior, the commission shall consider bids for a category 1 license in Region C under said chapter 23K.

Id. § 91(e). It appears that all aspects of the state-law components of the first clause have, as of the date of this

opinion, been complied with.  These statutory procedures have been supplemented by the terms of the state-law compact entered into by the Governor and the Mashpee Wampanoag, as described later.

The statute does not, by its literal terms, preclude issuance of a category 1 license in Region C if a compact has been approved.  However, KG argued before the district court and on appeal that the statute does bar issuance of a license if a compact is approved by the legislature by July 31 and the Commission has not then determined that the tribe will not have land taken into trust.  The defendants do not dispute that interpretation of the statute.

Moreover, the approved compact provides:

Section 91 of the Act provides that if a compact negotiated by the Governor is approved by the General Court by July 31, 2012, the [Commission] will not issue a request for Category 1 License applications in Region C unless and until it determines that the Tribe will not have land taken into trust for it by the United States Secretary of the Interior.

Mashpee Tribal-State Compact § 2.6.[3]  The compact repeatedly refers to the tribe's "exclusive" rights to conduct gaming in Region C if the compact receives legislative approval by July 31, 2012.[4]  See

_____

[3]  See H. 4260, 187th Gen. Court (Mass. 2012) (tribal-state compact as submitted by the Governor to the Massachusetts legislature).

[4]  The compact also contains a section governing what would happen "[i]f the Tribe's exclusive right to operate a casino within Region C is abrogated by the lawful issuance of a Category 1 License to operate a casino in Region C."  Mashpee Tribal-State

-8-

id. § 2.8 (noting that approval of the compact by the Massachusetts legislature by July 31, 2012 "will provide exclusivity in Region C for the Tribe"); id. § 9.1.4 (stating that if a compact is approved by the legislature by July 31, 2012, the Tribe would have "the opportunity to operate a casino in Region C on an exclusive basis"); id. § 9.1.5 (stating that "[p]roviding such exclusivity would also further the Commonwealth's policy of controlling the expansion of Gaming within Massachusetts, by limiting the total number of casinos within the Commonwealth to three"); id. § 9.2 (referring to "the creation, on an exclusive basis, of the opportunity to conduct casino gaming in Region C").

### 3. Other Tribe-Related Provisions

The Massachusetts Gaming Act also contains several other provisions relating to Indian gaming. The Act appropriates $5 million for use in negotiating and executing "a compact with a federally recognized Indian tribe in the commonwealth to establish a tribal casino in region C." 2011 Mass. Acts ch. 194, § 2A. The Commission is empowered to "provide assistance to the governor in negotiating a compact with a federally-recognized Indian tribe in the commonwealth." Mass. Gen. Laws ch. 23K, § 4(40). The Commission is required to:

---

Compact § 9.2.4. This provision allows the tribe to "elect to either: (a) cease operations of its casino within sixty (60) days," or "(b) continue under this Compact but reduce the Allocation [to the Commonwealth] to fifteen percent (15%) of Gross Gaming Revenues." Id.

> continue to evaluate the status of Indian
> tribes in the commonwealth including, without
> limitation, gaining federal recognition or
> taking land into trust for tribal economic
> development. The commission shall evaluate
> and make a recommendation to the governor and
> the chairs of the joint committee on economic
> development and emerging technologies as to
> whether it would be in the best interest of
> the commonwealth to enter into any
> negotiations with those tribes for the purpose
> of establishing Class III gaming on tribal
> land.

Id. § 67.

The Act creates a thirteen member "gaming policy advisory committee," and requires one of the governor's eight appointees to the committee to "be a representative of a federally recognized Indian tribe in the commonwealth." Id. § 68(a). The committee must meet at least once a year to make advisory recommendations to the Commission. Id. The Act expressly provides that the committee's recommendations "shall not be binding on the commission." Id.

B.      The IGRA

"Congress passed the Indian Gaming Regulatory Act in 1988 in order to provide a statutory basis for the operation and regulation of gaming by Indian tribes." Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 48 (1996). The IGRA was passed in part in response to the Court's decision in California v. Cabazon Band of Mission Indians, 480 U.S. 202 (1987), which held that California lacked authority to regulate bingo gambling conducted by Indian

-10-

tribes on Indian land within the state.  Id. at 221-22.  The IGRA creates a cooperative federal-state-tribal scheme for regulation of gaming hosted by federally recognized Indian tribes on Indian land. In doing so the IGRA allows the states a limited and closely defined role in the process.  It also limits the conditions under which tribes are allowed to enter into gaming.  Both of these limits are implicated in this case.

The IGRA categorizes gaming into three classes: Class I consists of "social games solely for prizes of minimal value or traditional forms of Indian gaming," 25 U.S.C. § 2703(6), Class II consists of bingo and certain card games that are either authorized by the law of the state or not explicitly prohibited by the state and played in the state, id. § 2703(7), and Class III consists of all other forms of gaming, id. § 2703(8).  A category 1 license would fall within Class III gaming.

The IGRA sets out when Class III gaming may be conducted:

Class III gaming activities shall be lawful on Indian lands only if such activities are--

(A) authorized by an ordinance or resolution that--

(i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,

(ii) meets the requirements of subsection (b) of this section, and

-11-

(iii) is approved by the Chairman,[5]

(B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and

(C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.

Id. § 2710(d)(1). Compliance with these conditions is required from both states and tribes.

At the heart of this case are the provisions of the IGRA which make clear that tribal gaming may only be conducted by an "Indian tribe" on "Indian lands," as both terms are defined in the IGRA. See, e.g., id. ("Class III gaming activities shall be lawful on Indian lands only if . . . ." (emphasis added)); id. § 2710(d)(2)(C) ("[C]lass III gaming activity on the Indian lands of the Indian tribe shall be fully subject to the terms and

---

[5] The term "Chairman" refers to the chair of the National Indian Gaming Commission (NIGC), created by the IGRA within the Department of the Interior to undertake certain functions related to Indian gaming. 25 U.S.C. § 2704.

The Chairman must approve any tribal ordinance allowing gaming "unless the Chairman specifically determines that-- (i) the ordinance or resolution was not adopted in compliance with the governing documents of the Indian tribe, or (ii) the tribal governing body was significantly and unduly influenced in the adoption of such ordinance or resolution by any person identified in section 2711(e)(1)(D) of this title." Id. § 2710(d)(2)(B).

The NIGC has authority to levy and collect fines and initiate proceedings to shut down gaming operations against tribal operators or contractors engaged in gaming, "for any violation of any provision of this chapter, any regulation prescribed by the Commission pursuant to this chapter, or tribal regulations, ordinances, or resolutions approved under section 2710 or 2712 of this title." Id. § 2713(a)(1).

-12-

conditions of the Tribal-State compact . . . ." (emphasis added); id. § 2710(d)(8)(A) ("The Secretary [of the Interior] is authorized to approve any Tribal-State compact entered into between an Indian tribe and a State governing gaming on Indian lands of such Indian tribe." (emphasis added)). The Supreme Court has recently remarked that under the IGRA, "an Indian tribe may conduct gaming operations on 'Indian lands.'" Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 132 S. Ct. 2199, 2203 n.1 (2012).

We highlight the two key IGRA provisions important to the equal protection challenge at issue here: the Indian lands definition and the compact process, both described below.

The IGRA defines the term "Indian tribe" as "any Indian tribe, band, nation, or other organized group or community of Indians which-- (A) is recognized as eligible by the Secretary for the special programs and services provided by the United States to Indians because of their status as Indians, and (B) is recognized as possessing powers of self-government." 25 U.S.C. § 2703(5).

Of particular importance is the term "Indian lands," which is defined as:

> (A) all lands within the limits of any Indian reservation; and
>
> (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

Id. § 2703(4).

The IGRA also makes clear that gaming may only be conducted if a tribal-state compact is negotiated and approved by the Secretary of the Interior. Id. § 2710(d)(1)(C), (d)(3)(B). As to the tribal-state negotiation process, the IGRA provides:

> (A) Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.[6]
>
> (B) Any State and any Indian tribe may enter into a Tribal-State compact governing gaming activities on the Indian lands of the Indian tribe, but such compact shall take effect only when notice of approval by the Secretary of such compact has been published by the Secretary in the Federal Register.

---

[6] The IGRA confers jurisdiction on the United States district courts over, inter alia, "any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact under paragraph (3) or to conduct such negotiations in good faith." 25 U.S.C. § 2710(d)(7)(A)(i). The provisions of that subsection "describe an elaborate remedial scheme designed to ensure the formation of a Tribal-State compact." Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 50 (1996).

The Seminole Tribe Court held that Congress lacked authority to abrogate the states' sovereign immunity to allow suit to be brought to enforce the good-faith requirement. Id. at 47. The Court also held that the Ex parte Young doctrine may not be used to enforce that requirement against state officials, and instead only the remedial scheme of § 2710(d)(7) may be used to enforce that right. Id. at 47, 76.

-14-

Id. § 2710(d)(3). Tribal-state compacts "may" cover a variety of subjects, including any "subjects that are directly related to the operation of gaming activities." Id. § 2710(d)(3)(C)(vii).

After such compacts are negotiated, they must be submitted to the Secretary of the Interior for approval. The IGRA provides: "(A) The Secretary is authorized to approve any Tribal-State compact entered into between an Indian tribe and a State governing gaming on Indian lands of such Indian tribe." Id. § 2710(d)(8).

Assuming there is a compact as defined in (A), the IGRA goes on to provide:

> (B) The Secretary may disapprove a compact described in subparagraph (A) only if such compact violates--
>
>> (i) any provision of this chapter,
>>
>> (ii) any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or
>>
>> (iii) the trust obligations of the United States to Indians.
>
> (C) If the Secretary does not approve or disapprove a compact described in subparagraph (A) before the date that is 45 days after the date on which the compact is submitted to the Secretary for approval, the compact shall be considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of this chapter.
>
> (D) The Secretary shall publish in the Federal Register notice of any Tribal-State compact

that is approved, or considered to have been approved, under this paragraph.

Id. Once a tribal-state compact is negotiated and approved by the Secretary, and the other requirements of § 2710(d)(1) are met, Class III gaming may be conducted.

The IGRA contains additional provisions in another section governing "[g]aming on lands acquired after October 17, 1988." Id. § 2719. The lands here were acquired by the Mashpee after October 17, 1988. This section provides that, except as provided in subsections (a) and (b), "gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988." Id. § 2719(a). Subsection (a) contains two exceptions relating to Indian reservations not relevant here. Subsection (b) contains several exceptions relevant only to particular tribes listed in the statute, and two general exceptions:

(1) Subsection (a) of this section will not apply when–

(A) the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination; or

                    (B) lands are taken into trust as part
               of—

                         (i) a settlement of a land claim,

                         (ii) the initial reservation of an
                         Indian tribe acknowledged by the
                         Secretary under the Federal
                         acknowledgment process, or

                         (iii) the restoration of lands for
                         an Indian tribe that is restored
                         to Federal recognition.

Id. § 2719(b). This section also provides that "[n]othing in this

section shall affect or diminish the authority and responsibility

of the Secretary to take the land into trust." Id. § 2719(c).

          The statute conferring authority on the Secretary of the

Interior to take land into trust is 25 U.S.C. § 465, which

authorizes the Secretary to take land into trust "for the purpose

of providing land for Indians." Id. Section 479 provides that

"[t]he term 'Indian' as used in this Act shall include all persons

of Indian descent who are members of any recognized Indian tribe

now under Federal jurisdiction." Id. § 479. The Secretary has

promulgated regulations governing the land into trust process. 25

C.F.R. pt. 151.

          The Supreme Court has interpreted the language of § 479

in a way which directly impacts the analysis here. In Carcieri v.

Salazar, 129 S. Ct. 1058 (2009), the Court held that "for purposes

of § 479, the phrase 'now under Federal jurisdiction' refers to a

tribe that was under federal jurisdiction at the time of the

statute's enactment" in June 1934.  129 S. Ct. at 1061.  The Court held that since the tribe at issue there had not argued that it was under federal jurisdiction in 1934, and the evidence in the record was undisputed and to the contrary, the Secretary lacked authority to take land into trust for the tribe.  Id. at 1068.  Neither the Mashpee nor the Aquinnah, the two federally recognized tribes in Massachusetts,[7] were federally recognized in 1934,[8] raising the serious issue of whether the Secretary has any authority, absent Congressional action, to take lands into trust for either tribe.

In a concurring opinion, Justice Breyer stated that the "interpretation that reads 'now' as meaning 'in 1934' may prove somewhat less restrictive than it at first appears" because "a tribe may have been 'under Federal jurisdiction' in 1934 even though the Federal Government did not believe so at the time."  Id. at 1069 (Breyer, J., concurring).  Justice Souter and Justice Ginsburg, concurring in part and dissenting in part, agreed with

_____

[7] The most recent list of federally recognized tribes published by the Bureau of Indian Affairs lists only these two tribes as Massachusetts tribes.  See Indian Entities Recognized and Eligible to Receive Services From the United States Bureau of Indian Affairs, 75 Fed. Reg. 60,810, 60,811, 60,813 (Oct. 1, 2010).

[8] See Final Determination for Federal Acknowledgment of the Mashpee Wampanoag Indian Tribal Council, Inc. of Massachusetts, 72 Fed. Reg. 8,007 (Feb. 22, 2007) (finding that the Mashpee meet the criteria for federal acknowledgment under 25 C.F.R. § 83.7); Final Determination for Federal Acknowledgment of the Wampanoag Tribal Council of Gay Head, Inc., 52 Fed. Reg. 4,193 (Feb. 10, 1987) (finding that the Aquinnah meet the criteria for federal acknowledgment under 25 C.F.R. § 83.7).

this analysis.  <u>Id.</u> at 1071 (Souter, J., concurring).  We do not know whether the Mashpee's land in trust application to the Secretary includes any such allegation or support for such a claim. No party has provided such information.

The Court recently summarized <u>Carcieri</u> as holding that "§ 465 authorizes the Secretary to take land into trust only for tribes that were 'under federal jurisdiction' in 1934." <u>Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians</u>, 132 S. Ct. at 2204. In a footnote, the Court remarked that it was not addressing the scope of <u>Carcieri</u>, including whether the tribe at issue there "was 'under federal jurisdiction' in 1934, as <u>Carcieri</u> requires," and "how that question relates to Patchak's allegation that the Band was not 'federally recognized' at the time."  <u>Id.</u> at 2204 n.2.

II.

A.      <u>The Complaint</u>

KG Urban Enterprises, LLC, is an equity development company that specializes in the redevelopment of urban brownfield sites.  Over the past four years, it has invested $4.6 million dollars in preparing a plan for converting a site in downtown New Bedford, Massachusetts, into an over $1 billion multi-use property that includes a gaming facility.  KG plans on applying for a Region C gaming license for that property "as soon as it is permitted to do so."

-19-

KG filed its complaint on November 22, 2011, the same day the Massachusetts Gaming Act was passed, naming as defendants the Governor of Massachusetts and the Commission members.

KG's complaint alleged, and the parties agree on appeal, that there are two federally recognized tribes in Massachusetts -- the Mashpee Wampanoag Tribe, and the Wampanoag Tribe of Gay Head (Aquinnah), both officially recognized after 1934. The Mashpee possess no Indian lands in Massachusetts. The Mashpee have passed a tribal ordinance authorizing gaming, which has been approved by the National Indian Gaming Commission (NIGC), satisfying one of the IGRA's requirements to conduct Class III gaming. See Letter from Tracie L. Stevens, Chairwoman, Nat'l Indian Gaming Comm'n, to Cedric Cromwell, Chairperson and President, Mashpee Wampanoag Tribe (June 5, 2012), available at http://www.nigc.gov/ Portals/0/NIGC%20Uploads/readingroom/gamingordinances/ mashpeewampanoagtribe/Mashpee.pdf. The letter from the NIGC approving the ordinance noted that "any Class III gaming must be conducted pursuant to a gaming compact entered into with the Commonwealth of Massachusetts, or pursuant to Class III gaming procedures approved by the Secretary of the Interior." Id. As to Indian lands, the letter stated that "[i]t is also my understanding that the Tribe has not yet acquired Indian lands as defined by IGRA. It is therefore important to note that approval is granted

for gaming only on Indian lands, as defined in IGRA, over which the tribe has jurisdiction." Id.

The Mashpee and the Governor of Massachusetts entered into a tribal-state compact on July 12, 2012. The compact provides that gaming may only be conducted on an "Approved Gaming Site" defined as "a single site on Indian Lands, as defined in IGRA, that is legally eligible under IGRA for the conduct of" gaming. Mashpee Tribal-State Compact § 3.3. The compact further provides that "the Tribe is authorized to operate [gaming] only in accordance with this Compact, IGRA and the Tribal Gaming Ordinance and the Tribe shall only conduct such Gaming on Indian Lands as authorized under IGRA." Id. § 4.1. The compact notes that "[t]he Tribe presently has no lands held in trust, for Gaming purposes or otherwise." Id. § 9.1.1. The compact provides it is to "become effective upon the publication of notice of approval by the United States Secretary of the Interior in the Federal Register in accordance with" the IGRA. Id. § 22. The compact was approved by the House of the Massachusetts legislature on July 18, 2012, and by the Senate on July 26, 2012. H. 4261, 187th Gen. Court (Mass. 2012). It is against this general backdrop that the legal issues are framed.

The most powerful of KG's theories on appeal is that § 91 of the Massachusetts Gaming Act discriminates on the basis of race, harming KG's ability to seek a commercial gaming license and the terms that would govern any such license, in violation of the Equal

-21-

Protection Clause of the Fourteenth Amendment.[9]  The essence of the argument is that while there are two federally recognized tribes, the Mashpee and the Aquinnah, neither possesses any Indian lands and so tribal gaming cannot be authorized under the IGRA.[10]  KG argues that since the Secretary has not (and most likely cannot under present law) authorize a Mashpee-Massachusetts gaming compact under the IGRA, the state has excluded KG from entering the gaming market and given the Mashpee a preference unlimited in duration. Since only the federal government, not the state, has plenary power to give tribes preferences (and even then limited), the state's attempt to prefer the Mashpee is a form of race discrimination and is not authorized by Congress.  KG argues that such racial discrimination requires more than mere rationality to justify it; the discrimination practiced here is inherently suspect and entails the highest scrutiny.  The weakness of the state's rationale for this preference is demonstrated by the inherent tension between § 91 and the "Indian lands" provision of the IGRA.  For the same reasons, KG argues that § 91 violates the Massachusetts Declaration of Rights.

---

[9]  The complaint also alleged that § 91 is preempted by the IGRA insofar as it authorizes Class III gaming without requiring that the IGRA's requirements be complied with.  This claim is not pursued on appeal.

[10]  While the Aquinnah possess a small parcel of land, the Commonwealth has taken the position that they have waived their right to conduct gaming on that land.

KG's complaint also raised equal protection claims as to the $5 million in funding for negotiation of a compact and the seat reserved for a representative of a federally recognized Indian tribe on the advisory committee.

The complaint alleged that § 91 of the Act caused and will cause to KG several injuries: (1) "KG will be locked out of the application process for a gaming license until July 31, 2012, and may never have an opportunity to compete for a license," if a tribal-state compact is entered into, (2) the uncertainty over whether non-tribal entities would be able to apply for a gaming license causes harm and is deterring investors and operators from pursuing opportunities in the southeast region, and (3) even if non-tribal applications were at some point accepted, licensees in Region C would be at a competitive disadvantage because the other two regions were likely to have operational casinos before Region C. The complaint further alleged that because "the federal process for awarding land-in-trust is in a state of paralysis in the wake of Carcieri . . . there is no prospect that the Mashpee Wampanoag will be in a position to engage in casino-style gaming consistent with the IGRA in the foreseeable future."

As to relief, KG requested (1) a declaratory judgment that the Massachusetts Gaming Act is unconstitutional in its entirety, or at a minimum as to its Indian tribe related provisions; (2) a declaration that the Act is preempted to the

extent it authorizes Indian tribes to engage in gaming without complying with the IGRA; (3) a preliminary and permanent injunction preventing the defendants from enforcing the unlawful provisions of the Massachusetts Gaming Act, and (4) an award of reasonable attorneys' fees.

B.        Procedural History

The same day it filed the complaint, KG also filed a motion for a preliminary injunction blocking the defendants from enforcing the challenged provisions of the Act. In support of the motion, KG attached an affidavit of KG's managing director, which essentially reiterated the facts as to KG's New Bedford project and the injuries to KG arising out of § 91 as alleged.

The defendants opposed the motion on the merits, and argued that KG's claims regarding § 91 were not ripe and the court accordingly lacked jurisdiction. The defendants also submitted, on January 27, 2012, an affidavit from Stephen P. Crosby, who was appointed Chairman of the Gaming Commission on December 13, 2011, stating that the Commission "will almost certainly not be accepting applications any earlier than October 2012," and possibly not until sometime in 2013. The Chairman was the only member of the Commission to be appointed at that point, the remaining members would need to be appointed,[11] and then the Commission would need to

_____

[11] The remaining members have since been appointed, with the final two members appointed on March 20, 2012. See Press Release, Governor Deval Patrick, Five-Member Massachusetts Gaming Commission

-24-

hire staff, develop criteria for applications, request applications for category 2 licenses, and only then finally solicit category 1 license applications. The affidavit concluded by stating that there was "little to no chance that the Commission will be in a position to award or issue any category 1 license before the second half of 2013."

On February 16, 2012, the district court denied KG's request for a preliminary injunction. KG Urban Enters., LLC v. Patrick, 839 F. Supp. 2d 388, 407 (D. Mass. 2012). The court first found that the issues of ripeness, standing, sovereign immunity, and Pullman abstention did not preclude it from addressing the merits, with the exception of KG's challenge to the advisory committee seat, which the district court dismissed on standing grounds. Id. at 396-99.

On the merits, the court rejected both of KG's legal theories. The court held that the Massachusetts Gaming Act was not preempted by the IGRA, in part because § 91 "does not create a separate tribal gaming regime in Massachusetts but rather establishes the procedures by which IGRA-authorized compacting may take place under Massachusetts law." Id. at 401.

---

Now Complete And Moving Forward With Business (Mar. 20, 2012), available at http://www.mass.gov/governor/pressoffice/ pressreleases/2012/2012320-five-member-gaming-commission- now-complete.html.

The court also rejected the equal protection claim as to § 91. The court treated the equal protection claims under federal law and state law as "coextensive" with one another. Id. at 402. The court reasoned that because § 91 of the Massachusetts Gaming Act was enacted in the state's exercise of its authority delegated to it under the IGRA, the Court's holding in Washington v. Confederated Bands & Tribes of the Yakima Indian Nation, 439 U.S. 463 (1979), mandated that only rational basis review be applied to the statute, rather than strict scrutiny. KG Urban Enters., 839 F. Supp. 2d at 404-05. Applying that standard, the court found that the rational basis test was satisfied. Id. at 405-06.

The district court also dismissed the complaint, explaining that "because plaintiff brings only a facial equal protection challenge to the Gaming Act and no further briefing or proceedings would affect this Court's constitutional analysis," dismissal was proper. Id. at 407. KG appeals.

III.

KG's equal protection claim presents a question of law and so is reviewed de novo. See, e.g., United States v. Rehlander, 666 F.3d 45, 47 (1st Cir. 2012) ("The issues before us are legal and our review is therefore de novo."). We review the district court's dismissal of the complaint de novo. See Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 532 (1st Cir. 2011), cert. denied, 183 L. Ed. 2d 615 (2012). KG requests

-26-

not only that its complaint be reinstated, but that the case be remanded with judgment entered in its favor and that § 91(e) be permanently enjoined. We review denials of both permanent and preliminary injunctive relief for abuse of discretion (with legal issues reviewed de novo). Mercado-Salinas v. Bart Enters. Int'l, Ltd., 671 F.3d 12, 19-20 (1st Cir. 2011); Animal Welfare Inst. v. Martin, 623 F.3d 19, 26 (1st Cir. 2010).

KG has narrowed the claims it has pursued on appeal. KG no longer advances its claim that the Massachusetts Gaming Act is directly in conflict with and so preempted by the IGRA, because the Commonwealth has conceded that nothing in the Massachusetts Gaming Act contemplated authorization of tribal gaming outside of the IGRA. KG has also declined to advance any argument as to the $5 million appropriation for use in negotiating a tribal-state compact.

Defendants argue (1) that KG's claim as to § 91 is not ripe and (2) that KG has no standing to challenge the composition of the advisory committee established by the Massachusetts Gaming Act.

We address the challenge to the advisory committee and KG's state-law claim before turning to the challenge to § 91.

A.        Standing to Pursue Advisory Committee Claim

We reject KG's challenge as to the advisory committee on standing grounds. KG's complaint does not plead any facts as to

why it has standing to challenge the committee's composition. Its sole argument is that <u>Buckley</u> v. <u>Valeo</u>, 424 U.S. 1 (1976) (per curiam), holds that an individual subject to the jurisdiction of a regulatory agency may challenge the legality of appointments to that body. <u>Buckley</u> was not so broad; rather it held that "[p]arty litigants <u>with sufficient concrete interests</u> at stake <u>may</u> have standing to raise constitutional questions of separation of powers with respect to an agency <u>designated to adjudicate their rights</u>." <u>Id.</u> at 117 (emphasis added). KG bears the burden and does not develop any argument that it has sufficently concrete interests at stake as to the advisory committee, or that <u>Buckley</u> applies to committees that are solely advisory. The contours of <u>Buckley</u>'s standing analysis are not well-defined, and at least one circuit has held that <u>Buckley</u> does not confer standing on plaintiffs who are not "directly subject to the governmental authority they seek to challenge, but merely assert that they are substantially affected by the exercise of that authority." <u>Comm. for Monetary Reform</u> v. <u>Bd. of Governors of the Fed. Reserve Sys.</u>, 766 F.2d 538, 543 (D.C. Cir. 1985). The dismissal of this claim for lack of standing is affirmed. <u>See</u> <u>Lujan</u> v. <u>Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992).

B.        <u>State Declaration of Rights Claim</u>

KG newly argues that it is entitled to greater protection under the state constitution than the federal. Before the district

court, KG initially argued that the standard for equal protection analysis was the same under the federal constitution and under the Massachusetts Declaration of Rights. KG later submitted a supplemental filing regarding Finch v. Commonwealth Health Insurance Connector Authority, 959 N.E.2d 970 (Mass. 2012), arguing that the decision "further demonstrates that the Act violates the Equal Protection Clause and Declaration of Rights."

While that opinion was issued after KG's motion for a preliminary injunction was filed, the legal principle for which KG cites the case was decided by the Supreme Judicial Court in an earlier opinion in the same case, before KG's motion was filed. See Finch v. Commonwealth Health Ins. Connector Auth., 946 N.E.2d 1262, 1276 (Mass. 2011) ("Where the Federal government has made a binding decision regarding the treatment of aliens, that decision will be reviewed according to the standards applicable to the Federal government even though the immediate actor may be a State government. In comparison, where the State acts on its own authority, it cannot shelter behind the existence of Congress's plenary authority, and its actions are subject to strict scrutiny review." (citation omitted)).

KG's failure to timely raise the argument that a different standard applies to its state-law claim leads to the conclusion that the state constitutional claim adds nothing to KG's claim in this court. See Nat'l Amusements, Inc. v. Town of Dedham,

-29-

43 F.3d 731, 748-49 (1st Cir. 1995) (holding that where a party treats federal and state constitutional provisions "identically" before the district court, the party has waived any argument that the provisions are distinct). We affirm dismissal of the state-law claim without prejudice, particularly because "the claim raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1).

C.        The Equal Protection Challenge to § 91

We turn now to the heart of KG's suit, the equal protection challenge to § 91.

We review de novo, Doe v. Bush, 323 F.3d 133, 138 (1st Cir. 2003), and reject the defendants' argument that the challenge is not ripe.[12] The equal protection challenge to § 91 is a legal question that is fit for judicial review. The fact that the case could be rendered moot -- for example, if the state Commission determines that land will not be taken into trust -- does not render the case unripe. Moreover, we have previously rejected a claim that the contingent nature of the tribal-state compacting process renders a suit unripe. Rhode Island v. Narrangansett Indian Tribe, 19 F.3d 685, 693-94 (1st Cir. 1994).[13]

---

[12] After the Mashpee Tribal-State Compact was approved by the Massachusetts legislature, the defendants withdrew their ripeness objection.

[13] KG satisfies the minimum requirements of Article III standing necessary to raise its equal protection challenge to § 91. See Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, Fla., 508 U.S. 656, 666 (1993) ("When the government erects a barrier that makes it more difficult for

-30-

Turning to the merits, the parties essentially agree that the level of scrutiny that applies to § 91 is dispositive of the equal protection claim.[14]   KG argues that § 91 constitutes a race-based preference, insofar as § 91 allows for Indian tribes who do not possess Indian lands, and so do not meet the IGRA's requirements, to negotiate a tribal-state compact and, if successful, preclude a competitive license from being awarded to

members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.  The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.").

[14]   KG does suggest that even if § 91 is subject to rational basis review, there is nothing that warrants Region C being treated differently from the other regions, and so § 91 fails even under rational basis review.  One aspect of this argument fails, as the legislature could have rationally concluded that the southeast portion of the state is the part of the state in which a federally recognized tribe would be most likely to acquire Indian lands, particularly given that the Aquinnah presently possess certain land in that region and the Mashpee have previously applied to have land in that region taken into trust.  See 73 Fed. Reg. 12,204 (Mar. 6, 2008).
    This does not address or foreclose KG's remaining arguments that the differentiation of Region C from the other two regions rests expressly on the tribal preference and if that preference fails, then the differentiation must fail.  Since the state legislature has tied the differentiation solely to the tribal preference, this is not an instance in which a state has merely decided to treat its regions separately.  See Montalvo-Huertas v. Rivera-Cruz, 885 F.2d 971, 981 (1st Cir. 1989) (explaining that "territorial uniformity is not a constitutional prerequisite" under the Equal Protection Clause (quoting McGowan v. Maryland, 366 U.S. 420, 427 (1961)) (internal quotation marks omitted)).

-31-

non-tribal applicants in Region C, at least until the Secretary of the Interior decides against the tribe's application.

The defendants respond with two arguments, which basically state all-or-nothing propositions. First, defendants broadly claim that, under Morton v. Mancari, 417 U.S. 535 (1974), the state's classification based on tribal status is political, not racial, in nature, and so subject only to rational basis review. Second, defendants argue, more narrowly, that, under Washington v. Confederated Bands & Tribes of the Yakima Indian Nation, 439 U.S. 463 (1979), even if the classification were racial in nature, it is authorized by the IGRA and thus subject only to rational basis review.

The defendants have not offered a middle ground nor have they formally argued that a state may choose to allow at least a limited grace period to tribes to attempt to obtain needed approvals under the IGRA from the Secretary (and Congress, if needed), though that is self-evidently one purpose of § 91.[15]

There are difficulties with each party's arguments. In the end, though, it is clear to us that KG's suit should not have been dismissed, and that KG is not entitled at this point to the equitable relief it seeks. For reasons discussed below, we affirm

---

[15] The Commissioner of the Massachusetts Gaming Commission has stated that "[w]e'll give the tribe whatever the appropriate amount of time is to get that decision made," and would "let the tribe have their fair shot to get the land in trust." Brenann, Patrick Expects Casino Deal Next Week, Cape Cod Times, June 13, 2012.

the denial of a grant of relief as an appropriate exercise of the discretion as to whether to issue both a preliminary injunction and a declaratory judgment under 28 U.S.C. § 2201(a). We first outline the legal issues raised as to the equal protection claim.

1.    <u>The Equal Protection Clause and State-Law Classifications Based on Tribal Status</u>

a.    <u>*Morton* v. *Mancari*</u>

The defendants' first argument is that a state-granted preference to a tribe is not a racial preference and so entails only rational basis review. This argument relies on language used by the Court in <u>Mancari</u>, 417 U.S. 535. There, the Court addressed whether a <u>federal</u> law granting an employment preference for qualified Indians in a federal agency, the Bureau of Indian Affairs (BIA), violated the equal protection component of the Due Process Clause of the Fifth Amendment. 417 U.S. at 537. A statute directed the Secretary of the Interior to adopt standards "for Indians who may be appointed, without regard to civil-service laws, to the various positions maintained, now or hereafter, by the Indian office, in the administration of functions or services affecting any Indian tribe. Such qualified Indians shall hereafter have the preference to appointment to vacancies in any such positions." <u>Id.</u> at 537-38 (quoting 25 U.S.C. § 472) (internal quotation mark omitted). The BIA adopted a policy that "[w]here two or more candidates who meet the established qualification requirements are available for filling a vacancy. If one of them

-33-

is an Indian, he shall be given preference in filling the vacancy."
Id. at 538 n.3.

The Court rejected the equal protection challenge to the federal statute. The Court first noted that "[t]he plenary power of Congress to deal with the special problems of Indians is drawn both explicitly and implicitly from the Constitution itself," citing the portion of the Commerce Clause allowing regulation of commerce "with the Indian tribes," as well as the treaty power. Id. at 551-52 (citing U.S. Const. art. I, § 8, cl. 3). The Court then noted that there was a "special relationship" between the federal government and Indian tribes, and that "[l]iterally every piece of legislation dealing with Indian tribes and reservations . . . single[s] out for special treatment a constituency of tribal Indians living on or near reservations." Id. at 552. It was "in this historical and legal context" that the Court addressed the equal protection claim. Id. at 553.

The Court held that "this preference does not constitute 'racial discrimination.' Indeed, it is not even a 'racial' preference. Rather, it is an employment criterion reasonably designed to further the cause of Indian self-government and to make the BIA more responsive to the needs of its constituent groups." Id. at 553-54 (footnote omitted). The Court further explained:

> The preference, as applied, is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and activities are

-34-

> governed by the BIA in a unique fashion. In
> the sense that there is no other group of
> people favored in this manner, the legal
> status of the BIA is truly <u>sui generis</u>.

<u>Id.</u> at 554 (citation and footnote omitted). This passage was
followed by rather pointed language that if the preference were
applied to employment in federal agencies not related to Indians,
a different question would be presented:

> Furthermore, the preference applies only to
> employment in the Indian service. The
> preference does not cover any other Government
> agency or activity, and we need not consider
> the obviously more difficult question that
> would be presented by a blanket exemption for
> Indians from all civil service examinations.
> Here, the preference is reasonably and
> directly related to a legitimate, nonracially
> based goal. This is the principal
> characteristic that generally is absent from
> proscribed forms of racial discrimination.

<u>Id.</u> at 554.

In a footnote, the Court remarked: "The preference is not
directed towards a 'racial' group consisting of 'Indians'; instead,
it applies only to members of 'federally recognized' tribes. This
operates to exclude many individuals who are racially to be
classified as 'Indians.' In this sense, the preference is
political rather than racial in nature." <u>Id.</u> at 553 n.24. The
Commonwealth relies on but overreads the footnote.

The Court concluded by explaining that "[a]s long as the
special treatment can be tied rationally to the fulfillment of
Congress' unique obligation toward the Indians, such legislative

-35-

judgments will not be disturbed," and that this standard was satisfied. Id. at 555.

Mancari's analysis as to federal laws giving preference based on "Congress' unique obligation toward the Indians" has been reaffirmed. See, e.g., Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 673 n.20 (1979) (noting that "this Court . . . has repeatedly held that the peculiar semisovereign and constitutionally recognized status of Indians justifies special treatment on their behalf when rationally related to the Government's 'unique obligation toward the Indians'" (quoting Mancari, 417 U.S. at 555)); United States v. Antelope, 430 U.S. 641, 645 (1977) ("Legislation with respect to these 'unique aggregations' has repeatedly been sustained by this Court against claims of unlawful racial discrimination." (citing Mancari, 417 U.S. at 552)); see also Duro v. Reina, 495 U.S. 676, 692 (1990) ("That Indians are citizens does not alter the Federal Government's broad authority to legislate with respect to enrolled Indians as a class, whether to impose burdens or benefits." (citing Antelope and Mancari)), superseded by statute as recognized in United States v. Lara, 541 U.S. 193, 197-98, 207 (2004).

However, it is quite doubtful that Mancari's language can be extended to apply to preferential state classifications based on tribal status. Mancari itself relied on several sources of federal authority to reach its holding, including the portion of the

Commerce Clause relating to Indian tribes, the treaty power, and the special trust relationship between Indian tribes and the federal government.  417 U.S. at 552-53.

The states have no such equivalent authority,[16] which is ceded by the Constitution to the federal government.  Further, the state preference here has to do with establishment of gaming facilities and not employment of Indians within agencies whose mission is to assist Indians.  Moreover, Mancari itself said that a different question would be presented by a preference in all civil services positions, and suggested that might be viewed as race based discrimination.

KG argues that the state's argument that no racial classification is involved is undercut by Rice v. Cayetano, 528 U.S. 495 (2000).  In Rice, a case under the Fifteenth Amendment, the Court declined to "extend the limited exception of Mancari to a new and larger dimension," id. at 520, and rejected the state of Hawaii's claim that Mancari applied to allow a voting scheme the state established regarding the Office of Hawaiian affairs, id. at 522. The voting scheme permitted only "Hawaiians," defined as "any

---

[16] Indeed, the state's broad reading of Mancari is inconsistent with the Court's later decision in Washington v. Confederated Bands & Tribes of the Yakima Indian Nation, 439 U.S. 463 (1979).  We discuss Yakima below, and cite it now for its holding that "[s]tates do not enjoy this same unique relationship with Indians" which "permits the Federal Government to enact legislation singling out tribal Indians, legislation that might otherwise be constitutionally offensive."  Id. at 501.

descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778," to vote for the trustees of the Office. Id. at 509 (quoting Haw. Rev. Stat. § 10-2). The Court held this special favorable treatment of Hawaiians was an impermissible racial classification. Id. at 517-22. The Court also held that "[a]ncestry can be a proxy for race," and was so in the context of the statute at issue there. Id. at 514. The effect of Rice on a Fourteenth Amendment claim involving federally recognized tribes is unclear.

The defendants cite no authority holding that state preferential classifications based on tribal status which are not authorized by federal law are nonetheless not racial classifications under Mancari. Instead, they cite a number of cases upholding state laws, which are not like this case, said to be authorized by federal law under the rationale of Yakima. See Artichoke Joe's Cal. Grand Casino v. Norton, 353 F.3d 712, 736 (9th Cir. 2003) (upholding state law regarding Indian gaming enacted pursuant to the IGRA); United States v. Garrett, 122 F. App'x 628, 631-33 (4th Cir. 2005) (same, following Artichoke Joe's); Squaxin Island Tribe v. Washington, 781 F.2d 715, 722 n.10 (9th Cir. 1986) (upholding state law where "the state is acting under a federal statute explicitly adjusting the state's jurisdiction over Indians"); Greene v. Comm'r of Minn. Dep't of Human Servs., 755

N.W.2d 713, 727 (Minn. 2008) (upholding state law where the law was "a direct response" to a federal law, citing Yakima); N.Y. Ass'n of Convenience Stores v. Urbach, 699 N.E.2d 904, 908 (N.Y. 1998) (upholding state law on the rationale of Yakima).

We turn next to the defendants' argument that nevertheless the state may still make the classification, because § 91 is authorized by the IGRA under Yakima. In the present posture of this case, that too is quite doubtful.

### b. *Yakima*

The premise of defendants' argument is their assertion that § 91 was "enacted under explicit authority granted by Congress in IGRA," and so is subject to rational basis review under Yakima. While stronger than the Mancari rationale, and the "authorization" rationale states a sound argument where it applies, it is questionable whether the IGRA "authorizes" the state's actions on the present facts. Indeed, KG in effect argues that as the Supreme Court has interpreted the land in trust statute in Carcieri, the intent of Congress was that the Secretary could not take land into trust for tribes such as the Mashpee, and so the intent of Congress is on the other side of the issue.

In Yakima, the Court addressed the equal protection analysis of state laws as to Indian tribes where the state acted pursuant to Congressional authorization. The State of Washington,

pursuant to authorization granted by federal Public Law 280,[17] enacted Chapter 36, extending the state's exercise of jurisdiction onto the Yakima Reservation in certain instances. 439 U.S. at 465-66. The Yakima Nation brought suit raising, among other claims, one of an equal protection violation. Id. at 466-67. The Court rejected the claim. The Court first found that the state law "violates neither the procedural nor the substantive terms of" Public Law 280, and so the state was authorized by Congress under that law to extend jurisdiction over the reservation. Id. at 499. The Court then addressed the equal protection claim. The Court rejected the argument that this was a racial classification giving rise to heightened scrutiny, explaining, in the opinion's key passage:

> It is settled that "the unique legal status of Indian tribes under federal law" permits the Federal Government to enact legislation singling out tribal Indians, legislation that might otherwise be constitutionally offensive. Morton v. Mancari, 417 U.S. 535, 551-552. States do not enjoy this same unique relationship with Indians, but Chapter 36 is not simply another state law. It was enacted in response to a federal measure explicitly designed to readjust the allocation of jurisdiction over Indians. The jurisdiction permitted under Chapter 36 is, as we have found, within the scope of the authorization of Pub. L. 280. And many of the classifications made by Chapter 36 are also made by Pub. L. 280. Indeed, classifications based on tribal status and land tenure inhere in many of the decisions of this Court

---

[17] Act of Aug. 15, 1953, ch. 505, 67 Stat. 588.

> involving jurisdictional controversies between tribal Indians and the States, see, e. g., United States v. McBratney, 104 U.S. 621. For these reasons, we find the argument that such classifications are "suspect" an untenable one. The contention that Chapter 36 abridges a "fundamental right" is also untenable. It is well established that Congress, in the exercise of its plenary power over Indian affairs, may restrict the retained sovereign powers of the Indian tribes. See, e. g., United States v. Wheeler, 435 U.S. 313. In enacting Chapter 36, Washington was legislating under explicit authority granted by Congress in the exercise of that federal power.

Id. at 500-01. This portion of Yakima has not been addressed by the Court since Yakima was decided.

It would be difficult to conclude that the IGRA "authorizes" the Massachusetts statute under these circumstances -- where there are no Indian lands in Region C at present within the meaning of the IGRA. Further, Carcieri may in the end prohibit the Secretary from taking the Mashpee lands into trust and so making them Indian lands, a question not yet resolved.

KG does not dispute that if a federally recognized tribe in Massachusetts currently possessed "Indian lands" within the meaning of the IGRA,[18] § 91 would fall sufficiently within the scope

---

[18]  As said, the IGRA defines "Indian lands" as (1) "lands within any Indian reservation" and (2) "lands title to which is either held in trust by the United States for the benefit of any Indian tribe or held by any Indian tribe or individual subject to jurisdiction by the United States against alienation and over which an Indian tribe exercises governmental power."  25 U.S.C. § 2703(4).  Neither party addresses the meaning of the "or held by any Indian tribe" portion of the statute or its relevance to this

-41-

of the IGRA's authorization and thus be subject to only rational basis review. Two circuits have reached this conclusion as to other states' Indian gaming laws. See Garrett, 122 F. App'x at 631-32; Artichoke Joe's, 353 F.3d at 736.[19]

KG argues with some force that the fact that a tribe may, in the future, acquire Indian lands is insufficient for § 91 to be considered "authorized" in the Yakima sense by the IGRA. Instead, KG argues, a tribe[20] must currently possess Indian lands in order for § 91 in any relevant sense to be authorized by Congress.

We outline the present state of affairs as we understand it. The Mashpee have submitted a land in trust application to the Bureau of Indian Affairs, requesting that the Bureau take land into trust for purposes of operating a casino in Massachusetts. See 77 Fed. Reg. 32,132, 32,133 (May 31, 2012) (BIA notice requesting comments for purposes of preparing an environmental impact statement for the proposed transfer into trust of 146.39 acres in the City of Taunton, to be taken into trust "for the development of a casino, hotel, parking, and other facilities supporting the casino," as well as a proposed transfer into trust of 170.1 acres

_____

case, and we do not pass on it here.

[19] The Ninth Circuit expressly reserved the question of "whether lands that are purchased specifically for the purpose of conducting class III gaming activities are 'Indian lands' within the meaning of IGRA." Artichoke Joe's Cal. Grand Casino v. Norton, 353 F.3d 712, 735 n.16 (9th Cir. 2003).

[20] Again, we distinguish the Aquinnah for the reasons stated.

-42-

in the Town of Mashpee, Massachusetts, for other purposes).  The agreed-on tribal-state compact has yet to be approved by the Secretary of the Interior, and the compact acknowledges that the Mashpee currently possess no land in trust.  The Governor agreed in the compact to "support the Tribe's" land in trust application. Mashpee Tribal-State Compact §§ 2.11, 9.1.6.

The strongest argument made by KG is based on Carcieri: that even if being in the application process to have a Secretary (with authority) take the purchased land into trust might suffice for purposes of being found authorized under the IGRA as a general matter, if no land can be taken into trust given Carcieri, § 91 cannot be viewed as authorized by the IGRA.  KG's argument starts from the premise that the Mashpee were federally recognized only after 1934.[21]  That being so, KG argues, unless the tribe can demonstrate that it was "under federal jurisdiction" in 1934 (in the view of three Justices),[22] or Congress positively grants the

---

[21]  See Final Determination for Federal Acknowledgment of the Mashpee Wampanoag Indian Tribal Council, Inc. of Massachusetts, 72 Fed. Reg. 8,007 (Feb. 22, 2007) (finding that the Mashpee meet the criteria for federal acknowledgment under 25 C.F.R. § 83.7).

[22]  The Department of the Interior has, post-Carcieri, approved a land in trust application for a tribe recognized after 1934, largely relying on the Carcieri concurring opinion.  See U.S. Dep't of Interior, Bureau of Indian Affairs, Trust Acquisition of, and Reservation Proclamation for the 151.87-acre Cowlitz Parcel in Clark County, Washington, for the Cowlitz Indian Tribe (Dec. 17, 2010), available at http://www.bia.gov/cs/groups/mywcsp/ documents/text/idc012719.pdf.  It was also based on facts which may be unique to the Cowlitz tribe, or at least not shared by the Mashpee.  There is no evidence one way or the other as to any such

-43-

Secretary new authority to take land into trust for post-1934 tribes, no land could be taken into trust given <u>Carcieri</u>. Moreover, it would be inconsistent with Congressional intent to view the IGRA, which permits gaming only on Indian lands, to authorize negotiation of a tribal-state compact where a tribe neither possessed such lands nor could acquire such lands in the absence of Congressional legislation. We have not been given the benefit of any view by the Secretary on any of these issues. Further, the Mashpee's land in trust application has not been placed in the record, so we do not know the predicate for the tribe's application.

KG's argument that the IGRA cannot "authorize" § 91 in these circumstances rests not only on <u>Carcieri</u> but also on the language of the IGRA, which repeatedly uses the term "Indian lands" in explaining when Class III gaming is permitted. In particular, the term is used in the context of explaining when tribes and states may negotiate a tribal-state compact:

> (A) Any Indian tribe <u>having jurisdiction over the Indian lands</u> upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State <u>in which such lands are located</u> to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a

facts as to the Mashpee. This determination has been challenged, including as to whether the Secretary had authority to take land into trust given Carcieri. See Clark County, Wash. v. U.S. Dep't of Interior, No. 11-00284 (D.D.C. filed Jan. 31, 2011).

-44-

request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.

(B) Any State and any Indian tribe may enter into a Tribal-State compact governing gaming activities <u>on the Indian lands of the Indian tribe</u>, but such compact shall take effect only when notice of approval by the Secretary of such compact has been published by the Secretary in the Federal Register.

25 U.S.C. § 2710(d)(3) (emphasis added). KG argues, as a matter of federal statutory interpretation, that the IGRA precludes a finding of authorization here.

The Sixth Circuit has interpreted subsection (A) in <u>Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians</u> v. <u>Engler</u>, 304 F.3d 616 (6th Cir. 2002). There, the court addressed whether an Indian tribe which did not possess Indian lands could compel a state to negotiate a tribal-state compact. The court held that the tribe could not do so, as "[h]aving jurisdiction over land for the casino is a condition precedent to negotiations and federal jurisdiction," based on the "plain language of § 2710(d)(3)(A)." <u>Id.</u> at 618. The court explained that "[s]ection (3)(A) describes not just an Indian tribe, but one that is in possession of land." <u>Id.</u> Of course, there is a distinction: there the tribe was trying to force the state to negotiate; here the state wishes to negotiate.[23]

---

[23] The Mashpee Tribal-State Compact states that "[t]he parties agree that IGRA negotiations need not be commenced or concluded until the Tribe has land in trust that is qualified for Gaming."

-45-

KG's argument based on Carcieri goes beyond the language of the IGRA describing when a compact may be negotiated to a more basic premise of the IGRA: that Class III gaming may occur only on Indian lands. Because the Secretary presently most likely lacks authority under the IGRA to take land into trust for the Mashpee, KG argues, there is no real prospect, absent an act of Congress, for land to be taken into trust, and so § 91 cannot be viewed as authorized.

The defendants' response to this reading of the statute relies not upon the terms of the statute, but on certain actions taken by the Secretary, albeit in factual situations not identical to this. The Secretary's present position appears to be that tribal-state compacts may be negotiated and approved by the Secretary even if a tribe does not currently possess Indian lands, conditional upon the tribe's acquiring Indian lands. The most recent position of the Secretary, cited by the parties, was articulated in a March 2011 approval of a tribal-state compact. There, the Secretary approved a tribal-state compact, with the authorization of any gaming facility under the compact contingent on the relevant land being "acquired in trust by the Secretary for the tribe."[24] 76 Fed. Reg. 11,258, 11,258 (Mar. 1, 2011). Whether

Mashpee Tribal-State Compact § 9.1.2.

[24] Neither party addresses whether the tribe whose compact was approved, the Confederated Tribes of the Warm Springs Reservation, was under federal jurisdiction in 1934 and so Carcieri would not

-46-

or not the Secretary's interpretation of the statute is correct or would apply to the Mashpee has not been briefed and is not before us.

The Secretary's views on whether tribal-state compacts may be approved before the tribe possesses land that is taken into trust have varied over the years.[25] In 2005, the Secretary disapproved a tribal-state compact between the State of Oregon and the Confederated Tribes of the Warm Springs Reservation of Oregon, on the basis that it could only approve a tribal-state compact "governing gaming on Indian lands of such Indian tribe." 25 U.S.C. § 2710(d)(8)(A) (emphasis added). The Department's reading was that "[t]his section does not authorize the Secretary to approve a compact for the conduct of Class III gaming activities on lands that are not now, and may never be, Indian lands of such Indian tribe." Because the land was not in trust, approval of the compact would run afoul of § 2710(d)(8)(A). The Secretary did note that the Department had "previously approved compacts for the regulation

---

pose a barrier to the taking of land into trust, in contrast to this situation.

[25] In 2010, the director of the Office of Indian Gaming in the Department of the Interior sent a letter to a member of the Michigan House of Representatives, which explained that the IGRA "does not authorize the Secretary to approve a compact for the conduct of Class III gaming on lands that are not now, and may never be, Indian lands of such Indian tribe. Thus if a compact is 'site specific' and identifies land that is not now or may never be Indian lands in accordance with IGRA and the tribe has not identified land that is eligible for gaming in the compact the compact may be disapproved."

of class III gaming activities before the specified lands qualified as Indian lands under IGRA," but upon further review of the statute, the Secretary changed his position. See also Second Discussion Draft of Legislation Regarding Off-Reservation Indian Gaming: Hearing Before the H. Comm. on Res., 109th Cong. 16 (2005) (statement of Ron Suppah, Chairman, Confederated Tribes of Warm Springs, Or.) (discussing this 2005 compact and explaining that "Interior has previously approved several compacts before the land was in trust, but four days before our 45-day review ended Interior announced to us with no forewarning that they were changing their policy and would require the Cascade Locks' lands to be in trust before they would consider our compact").

The Secretary has promulgated regulations governing the procedures for submitting a tribal-state compact, see 25 C.F.R. pt. 293, but these regulations do not address the matter before us.[26] The Secretary has also promulgated regulations regarding the procedures for acquiring the Secretary's approval to conduct gaming

---

[26] One of the comments received when the regulations were proposed was that the Department should clarify its position on "Indian lands," and another suggested removal of the phrase "on the tribe's Indian lands located within the State" from the definition of a tribal-state compact. 73 Fed. Reg. 74,004, 70,004-05 (Dec. 5, 2008). In response to the former comment, the Department stated that "[t]his regulation addresses the process for submission by tribes and States and consideration by the Secretary of Class III Tribal-State Gaming Compacts, and is not intended to address substantive issues." Id. In response to the latter comment, the Department removed the phrase "on the Tribe's Indian lands" from the definition of a Tribal-State compact under these procedural regulations. Id. at 70,005.

on lands acquired in trust after October 1988 under 25 U.S.C. § 2719(b)(1)(A).  These regulations permit tribes to apply for the Secretary's determination "for lands not yet held in trust at the same time that [the tribe] applies . . . to have the land taken into trust."  25 C.F.R. § 292.15.

In sum, whether § 91 is "authorized" by the IGRA such that it falls within Yakima and is subject to only rational basis review is far from clear, presents a difficult question of statutory interpretation, and implicates a practice of the Secretary of the Interior not challenged in this suit.  There is apparently no judicial authority addressing the question of whether a state may negotiate a tribal-state compact with a federally recognized tribe that does not presently possess Indian lands.[27]

The Secretary's present position does, though, provide some assistance to the Commonwealth.  If the Secretary is willing

---

[27]  The Ninth Circuit has addressed the separate question of whether the NIGC chairman must affirmatively determine that any Class III gaming is to take place on Indian lands before approving a tribal ordinance authorizing gaming.  The Ninth Circuit did not decide whether, if a tribal ordinance specifies a particular site on which gaming is to be conducted (i.e. is a site-specific ordinance), such a determination must take place.  N. Cnty. Cmty. Alliance, Inc. v. Salazar, 573 F.3d 738, 746 (9th Cir. 2009), cert. denied, 130 S. Ct. 2095 (2010).  It held that where an ordinance does not specify where gaming will take place (and there need be no such specification; i.e. the ordinance may be non-site-specific), no such determination need be made.  Id. at 746-47.  Regulations promulgated by the NIGC in 2008 now appear to require that, while non-site-specific ordinances may still be approved, in an application for a facility license from the NIGC, the tribe must submit information to enable the NIGC to make an Indian lands determination.  See id. at 747-48 (citing 25 C.F.R. § 559.2(a)).

under the IGRA to approve a tribal-state compact contingent on the relevant land being later acquired in trust, then the Commonwealth can argue that § 91 establishes a parallel mechanism, meant to facilitate the purposes of the IGRA, even if not precisely authorized by the IGRA, for a limited period of time.

The argument, of course, would become weaker with the passage of time and the continuation of the status that there are no "Indian lands" in the region.  The tribal-state compact entered into weakens the state's position by extending the period of time, as we explain below.  And the argument is qualitatively different, and even weaker, to the extent that Congressional action is required to provide the Secretary authority to take this land into trust.  It is in this context that we turn to the relief requested by KG and the disposition of this suit.

### 2.    KG's Requested Relief

In this suit, KG requests only equitable relief: a declaration that § 91 of the Massachusetts Gaming Act violates the Equal Protection Clause, preliminary and permanent injunctive relief, and associated attorneys' fees.  We view the appropriate resolution of this appeal through the lens of KG's request for equitable relief.

We start with KG's request for a preliminary injunction. Four factors govern the issuance of preliminary injunctive relief:

> (1) the likelihood that the party requesting
> the injunction will succeed on the merits of

its claim or claims; (2) the potential for irreparable harm to this party if the injunction is denied; (3) the balance of the relative hardships that will ensue following either a grant or denial; and (4) the effect (if any) that the grant or denial will have on the public interest.

González-Fuentes v. Molina, 607 F.3d 864, 875 (1st Cir. 2010), cert. denied, 131 S. Ct. 1568 (2011). In this case, several circumstances weigh strongly against granting injunctive relief at this point in time.

As to likelihood of success on the merits, the law is far from clear, and both sides have weaknesses in their positions, as we have just outlined. That factor is only one of four we consider. First, it is clear from the affidavit of the Chairman of the Gaming Commission that the Commission is not now soliciting applications for the other two regions, will not do so until October 2012 at the earliest, and may not do so until some point in 2013. As a result, the nature of KG's present injury is relatively limited. For reasons other than § 91, the category 1 licensing process may not move forward in Region C for months to come.

Second, the shape of the issues raised in this suit, and the attendant claims of injury, could well change depending on future events. It has already changed since oral argument, with the approval of the compact.

What is more difficult is the indefiniteness of when the Gaming Commission may, after August 1, 2012, determine that the

tribe will not have land taken into trust, which would then trigger the competitive license application process. The statute does not set a date for this determination, instead providing only that "if, at any time on or after August 1, 2012, the commission determines that the tribe will not have land taken into trust by the United States Secretary of the Interior, the commission shall consider bids for a category 1 license in Region C under said chapter 23K." 2011 Mass. Acts ch. 194, § 91(e). At oral argument, the defendants provided two "examples" of when this determination would "presumably" take place: (1) if the Secretary of the Interior disapproves the tribal-state compact or (2) if the Secretary denies the Mashpee's pending land in trust application.[28] The defendants stated that beyond those circumstances, the Commission would have to exercise its own authority in deciding whether to consider bids, but gave no suggestion as to when the Commission may do so.

There are two provisions in the Mashpee Tribal-State Compact that raise the prospect of further delays and cast doubt on

---

[28] Neither of these events appears to be associated with a fixed time limit under the IGRA and the land in trust statute. The approval or disapproval of a tribal-state compact must take place within "45 days after the date on which the compact is submitted to the Secretary for approval," 25 U.S.C. § 2710(d)(8)(C), but there is no explicit requirement as to when a compact must be submitted after it has been agreed on by the state and the tribe, see 25 C.F.R. § 293.7 (providing that "[t]he Indian tribe or State should submit the compact or amendment after it has been legally entered into by both parties"). As to the land in trust process, the relevant regulations provide only that "[t]he Secretary shall review all requests and shall promptly notify the applicant in writing of his decision." Id. § 151.12(a).

the two "examples" provided at oral argument. First, the compact provides that "if the United States Secretary of the Interior fails to accept such land in trust" as to the current land in trust application, "the Tribe may identify alternative land in Region C to be acquired in trust for Gaming under this Compact," and so presumably begin the land in trust process anew. Mashpee Tribal-State Compact § 5.2.2. This raises the prospect of multiple land in trust applications and further delay as to when the Commission might determine that the Mashpee will not have land taken into trust under § 91(e).

Second, the compact provides that if it "is not approved by the United States Secretary of the Interior as required by IGRA, the Governor agrees that, if requested by the Tribe, the Governor will immediately resume negotiations in good faith with the Tribe for an amended compact." Mashpee Tribal-State Compact § 18.8. This raises the prospect that even the Secretary's disapproval of the compact will not trigger a Commission decision to commence the competitive licensing process.

There also remains the potential that the Commission might wait years until the Secretary makes a determination as to the compact or land in trust application before itself acting under § 91.[29] And the Mashpee Tribal-State Compact provides that it shall

_____

[29] The Commissioner of the Massachusetts Gaming Commission has recently stated that "[w]e'll give the tribe whatever the appropriate amount of time is to get that decision made," and would "let the tribe have their fair shot to get the land in trust."

not "prevent the Tribe from challenging in a court of competent jurisdiction any such determination by the" Commission.  Mashpee Tribal-State Compact § 21.10.  This compact clause raises the prospect of a lengthy delay before a conclusive decision is made as to whether the commercial licensing process will go forward in Region C.

The Supreme Court recently took notice of the length of time involved in reaching a decision on a land in trust application. Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians, 132 S. Ct. at 2203 (noting the "lengthy administrative review" of a request to have land taken into trust for purposes of operating a casino).  Even if the lands were taken into trust by the Secretary, there could be further delays from litigation over the Secretary's decision.  The Court held that sovereign immunity does not bar suits under the Administrative Procedure Act challenging the Secretary's taking of land into trust, and that a nearby property owner satisfied the requirements of prudential standing to bring such a challenge.  Id. at 2209-12.  Moreover, the Court's opinion appears to suggest that a nearby property owner had standing to raise a challenge based on Carcieri to a land in trust determination.  Id. at 2203-04.

Beyond any such more typical delays in the land in trust application and compact approval processes, there is also the issue

---

Brenann, Patrick Expects Casino Deal Next Week, Cape Cod Times, June 13, 2012.

of whether the Secretary of the Interior has the authority take land into trust for the Mashpee in the wake of Carcieri. If the Secretary lacks such authority, that would require Congressional action before land could be taken into trust. This adds yet another layer of uncertainty and potential delay. If such lengthy delays occurred, this would undercut the argument that § 91 is meant as a temporary accommodation to the IGRA process to allow lands to be taken into trust and so is "authorized" in that minimal sense.

Given this situation, the lack of clear answers on questions of both state and federal law, the shifting of the nature of the injury to KG, and the apparent attempt to allow some time for the IGRA process to work (including any Carcieri fix), we cannot say there was an abuse of discretion in the denial of preliminary injunctive relief. "An injunction is an exercise of a court's equitable authority, to be ordered only after taking into account all of the circumstances that bear on the need for prospective relief." Salazar v. Buono, 130 S. Ct. 1803, 1816 (2010). "Equitable relief is not granted as a matter of course, and a court should be particularly cautious when contemplating relief that implicates public interests." Id. (citations omitted).

These considerations also lead us to affirm the denial of KG's request for injunctive and declaratory relief at this point in time. The Supreme Court has made clear that "the Declaratory Judgment Act has been understood to confer on federal courts unique

and substantial discretion in deciding whether to declare the rights of litigants.  On its face, the statute provides that a court 'may declare the rights and other legal relations of any interested party seeking such declaration.'" Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995) (quoting 28 U.S.C. § 2201(a)).  The Court has explained that "the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power."  Id. at 287 (quoting Pub. Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 243 (1952)) (internal quotation marks omitted).

The district court's dismissal of the complaint is another matter.  We simply cannot say that KG's equal protection claim as to § 91 fails to state a claim on which relief may be granted, or that the issuance of equitable relief may not be appropriate at some future date.

We also affirm the dismissal with prejudice of KG's claims as to the $5 million appropriation, the advisory committee seat, and the preemption challenge to § 91.  We dismiss KG's state-law claims without prejudice.  We remand the case for further proceedings consistent with this opinion.

No costs are awarded.