Justice Kagan
delivered the opinion of the Court.
A provision of the Indian Reorganization Act (IRA), 25 U. S. C. § 465, authorizes the Secretary of the Interior to acquire property “for the purpose of providing land for Indians.” Ch. 576, § 5, 48 Stat. 985. The Secretary here acquired land in trust for an Indian tribe seeking to open a *212 casino. Respondent David Patchak lives near that land and challenges the Secretary’s decision in a suit brought under the Administrative Procedure Act (APA), 5 U. S. C. § 701 et seq. Patchak claims that the Secretary lacked authority under § 465 to take title to the land, and alleges economic, environmental, and aesthetic harms from the casino’s operation.
We consider two questions arising from Patchak’s action. The first is whether the United States has sovereign immunity from the suit by virtue of the Quiet Title Act (QTA), 86 Stat. 1176. We think it does not. The second is whether Patchak has prudential standing to challenge the Secretary’s acquisition. We think he does. We therefore hold that Patchak’s suit may proceed.
1—1
The Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (Band) is an Indian tribe residing in rural Michigan. Although the Band has a long history, the Department of the Interior (DOI) formally recognized it only in 1999. See 63 Fed. Reg. 56936 (1998). Two years later, the Band petitioned the Secretary to exercise her authority under §465 by taking into trust a tract of land in Wayland Township, Michigan, known as the Bradley Property. The Band’s application explained that the Band would use the property “for gaming purposes,” with the goal of generating the “revenue necessary to promote tribal economic development, self-sufficiency and a strong tribal government capable of providing its members with sorely needed social and educational programs.” App. 52, 41.[1]
*213 In 2005, after a lengthy administrative review, the Secretary announced her decision to acquire the Bradley Property in trust for the Band. See 70 Fed. Reg. 25596. In accordance with applicable regulations, the Secretary committed to wait 30 days before taking action, so that interested parties could seek judicial review. See ibid.; 25 CFR § 151.12(b) (2011). Within that window, an organization called Michigan Gambling Opposition (or MichGO) filed suit alleging that the Secretary’s decision violated environmental and gaming statutes. The Secretary held off taking title to the property while that litigation proceeded. Within the next few years, a District Court and the D. C. Circuit rejected MichGO’s claims. See Michigan Gambling Opposition v. Kempthorne, 525 F. 3d 23, 27-28 (CADC 2008); Michigan Gambling Opposition v. Norton, 477 F. Supp. 2d 1 (DC 2007).
Shortly after the D. C. Circuit ruled against MichGO (but still before the Secretary took title), Patchak filed this suit under the APA advancing a different legal theory. He asserted that § 465 did not authorize the Secretary to acquire property for the Band because it was not a federally recognized tribe when the IRA was enacted in 1934. See App. 37. To establish his standing to bring suit, Patchak contended that he lived “in close proximity to” the Bradley Property and that a casino there would “destroy the lifestyle he has enjoyed” by causing “increased traffic,” “increased crime,” “decreased property values,” “an irreversible change in the rural character of the area,” and “other aesthetic, socioeconomic, and environmental problems.” Id., at 30-31. Notably, Patchak did not assert any claim of his own to the Bradley Property. He requested only a declaration that the decision to acquire the land violated the IRA and an injunction to stop the Secretary from accepting title. See id., at 38-39. The Band intervened in the suit to defend the Secretary’s decision.
In January 2009, about five months after Patchak filed suit, this Court denied certiorari in MichGO’s case, 555 U. S. 1137, *214 and the Secretary took the Bradley Property into trust. That action mooted Patchak’s request for an injunction to prevent the acquisition, and all parties agree that the suit now effectively seeks to divest the Federal Government of title to the land. See Brief for Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians 17 (hereinafter Tribal Petitioner); Brief for Federal Parties 11; Brief for Respondent Patchak 24-25. The month after the Government took title, this Court held in Carcieri v. Salazar, 555 U. S. 379, 382 (2009), that § 465 authorizes the Secretary to take land into trust only for tribes that were “under federal jurisdiction” in 1934.[2]
The District Court dismissed the suit without considering the merits (including the relevance of Carcieri), ruling that Patchak lacked prudential standing to challenge the Secretary’s acquisition of the Bradley Property. The court reasoned that the injuries Patchak alleged fell outside §465’s “zone of interests.” 646 F. Supp. 2d 72, 76 (DC 2009). The D. C. Circuit reversed that determination. See 632 F. 3d 702, 704-707 (2011). The court also rejected the Secretary’s and the Band’s alternative argument that by virtue of the QTA, sovereign immunity barred the suit. See id., at 707-712. The latter ruling conflicted with decisions of three Circuits holding that the United States has immunity from suits like Patchak’s. See Neighbors for Rational Development, Inc. v. Norton, 379 F. 3d 956, 961-962 (CA10 2004); Metropolitan Water Dist. of Southern Cal. v. United States, 830 F. 2d 139, 143-144 (CA9 1987) (per curiam); Florida Dept. of Bus. Regulation v. Department of Interior, 768 F. 2d 1248, 1253-1255 (CA11 1985). We granted certiorari to review both of *215 the D. C. Circuit’s holdings, 565 U. S. 1092 (2011), and we now affirm.
II
We begin by considering whether the United States’ sovereign immunity bars Patchak’s suit under the APA. That requires us first to look to the APA itself and then, for reasons we will describe, to the QTA. We conclude that the United States has waived its sovereign immunity from Patchak’s action.
The APA generally waives the Federal Government’s immunity from a suit “seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority.” 5 U. S. C. § 702. That waiver would appear to cover Patchak’s suit, which objects to official action of the Secretary and seeks only non-monetary relief. But the APA’s waiver of immunity comes with an important carve-out: The waiver does not apply “if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought” by the plaintiff. Ibid. That provision prevents plaintiffs from exploiting the APA’s waiver to evade limitations on suit contained in other statutes. The question thus becomes whether another statute bars Patch-ak’s demand for relief.
The Government and Band contend that the QTA does so. The QTA authorizes (and so waives the Government’s sovereign immunity from) a particular type of action, known as a quiet title suit: a suit by a plaintiff asserting a “right, title, or interest” in real property that conflicts with a “right, title, or interest” the United States claims. 28 U. S. C. § 2409a(d). The statute, however, contains an exception: The QTA’s authorization of suit “does not apply to trust or restricted Indian lands.” § 2409a(a). According to the Government and Band, that limitation on quiet title suits satisfies the APA’s carve-out and so forbids Patchak’s suit. In the Band’s words, the QTA exception retains “the United States’ full *216 immunity from suits seeking to challenge its title to or impair its legal interest in Indian trust lands.” Brief for Tribal Petitioner 18.
Two hypothetical examples might help to frame consideration of this argument. First, suppose Patchak had sued under the APA claiming that he owned the Bradley Property and that the Secretary therefore could not take it into trust. The QTA would bar that suit, for reasons just suggested. True, it fits within the APA’s general waiver, but the QTA specifically authorizes quiet title actions (which this hypothetical suit is) except when they involve Indian lands (which this hypothetical suit does). In such a circumstance, a plaintiff cannot use the APA to end-run the QTA’s limitations. “[W]hen Congress has dealt in particularity with a claim and [has] intended a specified remedy”—including its exceptions—to be exclusive, that is the end of the matter; the APA does not undo the judgment. Block v. North Dakota ex rel. Board of Univ. and School Lands, 461 U. S. 273, 286, n. 22 (1983) (quoting H. R. Rep. No. 94-1656, p. 13 (1976)).
But now suppose that Patchak had sued under the APA claiming only that use of the Bradley Property was causing environmental harm, and raising no objection at all to the Secretary’s title. The QTA could not bar that suit because even though involving Indian lands, it asserts a grievance altogether different from the kind the statute concerns. Justice Scalia, in a former life as Assistant Attorney General, made this precise point in a letter to Congress about the APA’s waiver of immunity (which we hasten to add, given the author, we use not as legislative history, but only for its persuasive force). When a statute “is not addressed to the type of grievance which the plaintiff seeks to assert,” then the statute cannot prevent an APA suit. Id., at 28 (May 10, 1976, letter of Assistant Atty. Gen. A. Scalia).[3]
*217 We think that principle controls Patehak’s case: The QTA’s “Indian lands” clause does not render the Government immune because the QTA addresses a kind of grievance different from the one Patchak advances. As we will explain, the QTA—whose full name, recall, is the Quiet Title Act— concerns (no great surprise) quiet title actions. And Patch-ak’s suit is not a quiet title action, because although it contests the Secretary’s title, it does not claim any competing interest in the Bradley Property. That fact makes the QTA’s “Indian lands” limitation simply inapposite to this litigation.
In reaching this conclusion, we need look no further than the QTA’s text. From its title to its jurisdictional grant to its venue provision, the Act speaks specifically and repeatedly of “quiet title” actions. See 86 Stat. 1176 (“An Act [t]o permit suits to adjudicate certain real property quiet title actions”); 28 U. S. C. § 1346(f) (giving district courts jurisdiction over “civil actions ... to quiet title” to property in which the United States claims an interest); § 1402(d) (setting forth venue for “[a]ny civil action ... to quiet title” to property in which the United States claims an interest). That term is universally understood to refer to suits in which a plaintiff not only challenges someone else’s claim, but also asserts his own right to disputed property. See, e. g., Black’s Law Dictionary 34 (9th ed. 2009) (defining an “action to quiet title” *218 as “[a] proceeding to establish a plaintiff’s title to land by compelling the adverse claimant to establish a claim or be forever estopped from asserting it”); Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg., 545 U. S. 308, 315 (2005) (“[T]he facts showing the plaintiff’s title . . . are essential parts of the plaintiff’s [quiet title] cause of action” (quoting Hopkins v. Walker, 244 U. S. 486, 490 (1917))).
And the QTA’s other provisions make clear that the recurrent statutory term “quiet title action” carries its ordinary meaning. The QTA directs that the complaint in such an action “shall set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property.” 28 U. S. C. § 2409a(d). If the plaintiff does not assert any such right (as Patchak does not), the statute cannot come into play.[4] Further, the QTA provides an option for the United States, if it loses the suit, to pay “just compensation,” rather than return the property, to the “person determined to be entitled” to it. §2409a(b). That provision makes perfect sense in a quiet title action: If the plaintiff is found to own the property, the Government can satisfy his claim through an award of money (while still retaining the land for its operations). But the provision makes no sense in a suit like this one, where Patchak does not assert a right *219 to the property. If the United States loses the suit, an award of just compensation to the rightful owner (whoever and wherever he might be) could do nothing to satisfy Patch-ak’s claim.[5]
In two prior cases, we likewise described the QTA as addressing suits in which the plaintiff asserts an ownership interest in Government-held property. In Block v. North Dakota ex rel. Board of Univ. and School Lands, 461 U. S. 273 (1982), we considered North Dakota’s claim to land that the United States viewed as its own. We held that the State could not circumvent the QTA’s statute of limitations by invoking other causes of action, among them the APA. See id., at 277-278, 286, n. 22. The crux of our reasoning was that Congress had enacted the QTA to address exactly the kind of suit North Dakota had brought. Prior to the QTA, we explained, “citizens asserting title to or the right to possession of lands claimed by the United States” had no recourse; by passing the statute, “Congress sought to rectify this state of affairs.” Id., at 282. Our decision reflected that legislative purpose: Congress, we held, “intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States’ title to real property.” Id., at 286. We repeat: “adverse claimants,” *220 meaning plaintiffs who themselves assert a claim to property-antagonistic to the Federal Government’s.
Our decision in United States v. Mottaz, 476 U. S. 834 (1986), is of a piece. There, we considered whether the QTA, or instead the Tucker Act or General Allotment Act, governed the plaintiff’s suit respecting certain allotments of land held by the United States. We thought the QTA the relevant statute because the plaintiff herself asserted title to the property. Our opinion quoted the plaintiff’s own description of her suit: “At no time in this proceeding did [the plaintiff] drop her claim for title. To the contrary, the claim for title is the essence and bottom line of [the plaintiff’s] case.” Id., at 842 (quoting Brief for Respondent in Mottaz, O. T. 1985, No. 85-546, p. 3). That fact, we held, brought the suit “within the [QTA’s] scope”: “What [the plaintiff] seeks is a declaration that she alone possesses valid title.” 476 U. S., at 842. So once again, we construed the QTA as addressing suits by adverse claimants.
But Patchak is not an adverse claimant—and so the QTA (more specifically, its reservation of sovereign immunity from actions respecting Indian trust lands) cannot bar his suit. Patchak does not contend that he owns the Bradley Property, nor does he seek any relief corresponding to such a claim. He wants a court to strip the United States of title to the land, but not on the ground that it is his and not so that he can possess it. Patchak’s lawsuit therefore lacks a defining feature of a QTA action. He is not trying to disguise a QTA suit as an APA action to circumvent the QTA’s “Indian lands” exception. Rather, he is not bringing a QTA suit at all. He asserts merely that the Secretary’s decision to take land into trust violates a federal statute—a garden-variety APA claim. See 5 U. S. C. §§ 706(2)(A), (C) (“The reviewing court shall .. . hold unlawful and set aside agency action ... not in accordance with law [or] in excess of statutory jurisdiction [or] authority”). Because that is true—because in then-Assistant Attorney General Scalia’s words, the QTA is “not *221 addressed to the type of grievance which [Patchak] seeks to assert,” H. R. Rep. No. 94-1656, at 28—the QTA’s limitation of remedies has no bearing. The APA’s general waiver of sovereign immunity instead applies.
The Band and Government, along with the dissent, object to this conclusion on three basic grounds. First, they contend that the QTA speaks more broadly than we have indicated, waiving immunity from suits “to adjudicate a disputed title to real property in which the United States claims an interest.” 28 U. S. C. §2409a(a). That language, the argument goes, encompasses all actions contesting the Government’s legal interest in land, regardless whether the plaintiff claims ownership himself. See Brief for Federal Parties 19-20; Reply Brief for Tribal Petitioner 4-6; post, at 235 (Sotomayor, J., dissenting). The QTA (not the APA) thus becomes the relevant statute after all—as to both its waiver and its “corresponding” reservation of immunity from suits involving Indian lands. Reply Brief for Tribal Petitioner 6.
But the Band and Government can reach that result only by neglecting key words in the relevant provision. That sentence, more fully quoted, reads: “The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest.” §2409a(a) (emphasis added). And as we have already noted, “this section”—§ 2409a—includes a host of indications that the “civil action” at issue is an ordinary quiet title suit: Just recall the section’s title (“Real property quiet title actions”), and its pleading requirements (the plaintiff “shall set forth with particularity the nature of the right, title, or interest which [he] claims”), and its permission to the Government to remedy an infraction by paying “just compensation.” Read with reference to all these provisions (as well as to the QTA’s contemporaneously enacted jurisdictional and venue sections), the waiver clause rebuts, rather than supports, the Band’s and the Government’s argument: That clause speaks *222 not to any suit in which a plaintiff challenges the Government’s title, but only to an action in which the plaintiff also claims an interest in the property.
The Band and Government next invoke cases holding that “when a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons,” the statute may “impliedly preclude[]” judicial review “of those issues at the behest of other persons.” Block v. Community Nutrition Institute, 467 U. S. 340, 349 (1984); see United States v. Fausto, 484 U. S. 439, 456 (1988). Here, the Band and Government contend, the QTA’s specific authorization of adverse claimants’ suits creates a negative implication: wow-adverse claimants like Patchak cannot challenge Government ownership of land under any other statute. See Reply Brief for Tribal Petitioner 7-10; Reply Brief for Federal Parties 7-9; see also post, at 230. The QTA, says the Band, thus “preempts [Patchak’s] more general remedies.” Brief for Tribal Petitioner 23 (internal quotation marks omitted).
But we think that argument faulty, and the cited cases inapposite, for the reason already given: Patchak is bringing a different claim, seeking different relief, from the kind the QTA addresses. See supra, at 217-221. To see the point, consider a contrasting example. Suppose the QTA authorized suit only by adverse claimants who could assert a property interest of at least a decade’s duration. Then suppose an adverse claimant failing to meet that requirement (because, say, his claim to title went back only five years) brought suit under a general statute like the APA. We would surely bar that suit, citing the cases the Government and Band rely on; in our imaginary statute, Congress delineated the class of persons who could bring a quiet title suit, and that judgment would preclude others from doing so. But here, once again, Patchak is not bringing a quiet title action at all. He is not claiming to own the property, and he is not demanding that the court transfer the property to him. So to succeed in *223 their argument, the Government and Band must go much further than the cited cases: They must say that in authorizing one person to bring one kind of suit seeking one form of relief, Congress barred another person from bringing another kind of suit seeking another form of relief. Presumably, that contention would extend only to suits involving similar subject matter—i. e., the Government’s ownership of property. But that commonality is not itself sufficient. We have never held, and see no cause to hold here, that some general similarity of subject matter can alone trigger a remedial statute’s preclusive effect.
Last, the Band and Government argue that we should treat Patchak’s suit as we would an adverse claimant’s because they equally implicate the “Indian lands” exception’s policies. According to the Government, allowing challenges to the Secretary’s trust acquisitions would “pose significant barriers to tribes[’] . . . ability to promote investment and economic development on the lands.” Brief for Federal Parties 24. That harm is the same whether or not a plaintiff claims to own the land himself. Indeed, the Band argues that the sole difference in this suit cuts in its direction, because non-adverse claimants like Patchak have “the most remote injuries and indirect interests in the land.” Brief for Tribal Petitioner 13; see Reply Brief for Federal Parties 11-12; see also post, at 228, 234, 236.[6]
That argument is not without force, but it must be addressed to Congress. In the QTA, Congress made a judgment about how far to allow quiet title suits—to a point, but no further. (The “no further” includes not only the “Indian *224 lands” exception, but one for security interests and water rights, as well as a statute of limitations, a bar on jury trials, jurisdictional and venue constraints, and the just compensation option discussed earlier.) Perhaps Congress would— perhaps Congress should—make the identical judgment for the full range of lawsuits pertaining to the Government’s ownership of land. But that is not our call. The Band assumes that plaintiffs like Patchak have a lesser interest than those bringing quiet title actions, and so should be precluded a fortiori. But all we can say is that Patchak has a different interest. Whether it is lesser, as the Band argues, because not based on property rights; whether it is greater because implicating public interests; or whether it is in the end exactly the same—that is for Congress to tell us, not for us to tell Congress. As the matter stands, Congress has not assimilated to quiet title actions all other suits challenging the Government’s ownership of property. And so when a plaintiff like Patchak brings a suit like this one, it falls within the APA’s general waiver of sovereign immunity.
I—l 1—1 )—I
We finally consider the Band’s and the Government’s alternative argument that Patchak cannot bring this action because he lacks prudential standing. This Court has long held that a person suing under the APA must satisfy not only Article Ill’s standing requirements, but an additional test: The interest he asserts must be “arguably within the zone of interests to be protected or regulated by the statute” that he says was violated. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U. S. 150, 153 (1970). Here, Patchak asserts that in taking title to the Bradley Property, the Secretary exceeded her authority under § 465, which authorizes the acquisition of property “for the purpose of providing land for Indians.” And he alleges that this statutory violation will cause him economic, environmental, and aesthetic harm as a nearby property owner. See supra, *225 at 213. The Government and Band argue that the relationship between § 465 and Patchak’s asserted interests is insufficient. That is so, they contend, because the statute focuses on land acquisition, whereas Patchak’s interests relate to the land’s use as a casino. See Brief for Tribal Petitioner 46 (“The Secretary’s decision to put land into trust does not turn on any particular use of the land, gaming or otherwise[,] . . . [and] thus has no impact on [Patchak] or his asserted interests”); Brief for Federal Parties 34 (“[L]and may be taken into trust for a host of purposes that have nothing at all to do with gaming”). We find this argument unpersuasive.
The prudential standing test Patchak must meet “is not meant to be especially demanding.” Clarke v. Securities Industry Assn., 479 U. S. 388, 399 (1987). We apply the test in keeping with Congress’s “evident intent” when enacting the APA “to make agency action presumptively reviewable.” Ibid. We do not require any “indication of congressional purpose to benefit the would-be plaintiff.” Id., at 399-400.[7] And we have always conspicuously included the word “arguably” in the test to indicate that the benefit of any doubt goes to the plaintiff. The test forecloses suit only when a plaintiff’s “interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.” Id., at 399.
Patchak’s suit satisfies that standard, because § 465 has far more to do with land use than the Government and Band *226 acknowledge. Start with what we and others have said about §465’s context and purpose. As the leading treatise on federal Indian law notes, § 465 is “the capstone” of the IRA’s land provisions. F. Cohen, Handbook of Federal Indian Law § 15.07[1][a], p. 1010 (2005 ed.) (hereinafter Cohen). And those provisions play a key role in the IRA’s overall effort “to rehabilitate the Indian’s economic life,” Mescalero Apache Tribe v. Jones, 411 U. S. 145, 152 (1973) (internal quotation marks omitted). “Land forms the basis” of that “economic life,” providing the foundation for “tourism, manufacturing, mining, logging, . .. and gaming.” Cohen § 15.01, at 965. Section 465 thus functions as a primary mechanism to foster Indian tribes’ economic development. As the D. C. Circuit explained in the MichGO litigation, the section “provides] lands sufficient to enable Indians to achieve self-support.” Michigan Gambling, 525 F. 3d, at 31 (internal quotation marks omitted); see Morton v. Mancari, 417 U. S. 535, 542 (1974) (noting the IRA’s economic aspect). So when the Secretary obtains land for Indians under § 465, she does not do so in a vacuum. Rather, she takes title to properties with at least one eye directed toward how tribes will use those lands to support economic development.
The Department’s regulations make this statutory concern with land use crystal clear. Those regulations permit the Secretary to acquire land in trust under § 465 if the “land is necessary to facilitate tribal self-determination, economic development, or Indian housing.” 25 CFR § 151.3(a)(3). And they require the Secretary to consider, in evaluating any acquisition, both “[t]he purposes for which the land will be used” and the “potential conflicts of land use which may arise.” §§ 151.10(c), 151.10(f); see § 151.11(a). For “off-reservation acquisitions” made “for business purposes”—like the Bradley Property—the regulations further provide that the tribe must “provide a plan which specifies the anticipated economic benefits associated with the proposed use.” § 151.11(c). DOI’s regulations thus shoy that the statute’s *227 implementation centrally depends on the projected use of a given property.
The Secretary’s acquisition of the Bradley Property is a ease in point. The Band’s application to the Secretary highlighted its plan to use the land for gaming purposes. See App. 41 (“[TJrust status for this Property is requested in order for the Tribe to acquire property on which it plans to conduct gaming”); id., at 60-61 (“The Tribe intends to . . . renovate the existing . . . building into a gaming facility . . . to offer Class II and/or Class III gaming”). Similarly, DOFs notice of intent to take the land into trust announced that the land would “be used for the purpose of construction and operation of a gaming facility,” which the Department had already determined would meet the Indian Gaming Regulatory Act’s requirements. 70 Fed. Reg. 25596; 25 U. S. C. §§ 2701-2721. So from start to finish, the decision whether to acquire the Bradley Property under § 465 involved questions of land use.
And because § 465’s implementation encompasses these issues, the interests Patchak raises—at least arguably—fall “within the zone .. . protected or regulated by the statute.” If the Government had violated a statute specifically addressing how federal land can be used, no one would doubt that a neighboring landowner would have prudential standing to bring suit to enforce the statute’s limits. The difference here, as the Government and Band point out, is that §465 specifically addresses only land acquisition. But for the reasons already given, decisions under the statute are closely enough and often enough entwined with considerations of land use to make that difference immaterial. As in this very casé, the Secretary will typically acquire land with its eventual use in mind, after assessing potential conflicts that use might create. See 25 CFR §§ 151.10(c), 151.10(f), 151.11(a). And so neighbors to the use (like Patchak) are reasonable—indeed, predictable—challengers of the Secretary’s decisions: Their interests, whether eco *228 nomic, environmental, or aesthetic, come within § 465⅛ regulatory ambit.
* * *
The QTA’s reservation of sovereign immunity does not bar Patchak’s suit. Neither does the doctrine of prudential standing. We therefore affirm the judgment of the D. C. Circuit, and remand the case for further proceedings consistent with this opinion.

It is so ordered.

 Under the Indian Gaming Regulatory Act, 25 U. S. C. §§ 2701-2721, an Indian tribe may conduct gaming operations on “Indian lands,” § 2710, which include lands “held in trust by the United States for the benefit of any Indian tribe,” § 2703(4)(B). The application thus requested the Secretary to take the action necessary for the Band to open a casino.

 The merits of Patchak’s case are not before this Court. We therefore express no view on whether the Band was “under federal jurisdiction” in 1934, as Carcieri requires. Nor do we consider how that question relates to Patchak’s allegation that the Band was not “federally recognized” at the time. Cf. Carcieri, 555 U. S., at 397-399 (Breyer, J., concurring) (discussing this issue).

 According to the dissent, we should look only to the kind of relief a plaintiff seeks, rather than the type of grievance he asserts, in deciding whether another statute bars an APA action. See post, at 232-233 (opin *217 ion of SOTOMAYOR, J.). But the dissent’s test is inconsistent with the one we adopted in Block, which asked whether Congress had particularly dealt with a “claim.” See Block v. North Dakota ex rel. Board of Univ. and School Lands, 461 U. S. 273, 286, n. 22 (1983). And the dissent’s approach has no obvious limits. Suppose, for example, that Congress passed a statute authorizing a particular form of injunctive relief in a procurement contract suit except when the suit involved a “discretionary function” of a federal employee. Cf. 28 U. S. C. § 2680(a). Under the dissent’s method, that exception would preclude any APA suit seeking that kind of injunctive relief if it involved a discretionary function, no matter what the nature of the claim. That implausible result demonstrates that limitations on relief cannot sensibly be understood apart from the claims to which they attach.

 The dissent contends that the QTA omits two other historical requirements for quiet title suits. See post, at 234-235. But many States had abandoned those requirements by the time the QTA was passed. See S. Rep. No. 92-575, p. 6 (1971) (noting “wide differences in State statutory and decisional law” on quiet title suits); Steadman, “Forgive the U. S. Its Trespasses?”: Land Title Disputes With the Sovereign—Present Remedies and Prospective Reforms, 1972 Duke L. J. 15, 48-49, and n. 152 (stating that cases had disputed whether a quiet title plaintiff needed to possess the land); Welch v. Kai, 4 Cal. App. 3d 374, 380-381, 84 Cal. Rptr. 619, 622-623 (1970) (allowing a quiet title action when the plaintiff claimed only an easement); Benson v. Fekete, 424 S. W. 2d 729 (Mo. 1968) (en banc) (same). So Congress in enacting the QTA essentially chose one contemporaneous form of quiet title action.

 The legislative history, for those who think it useful, further shows that the QTA addresses quiet title actions, as ordinarily conceived. The Senate Report states that the QTA aimed to alleviate the “[glrave inequity” to private parties “excluded, without benefit of a recourse to the courts, from lands they have reason to believe are rightfully theirs.” S. Rep. No. 92-575, at 1. Similarly, the House Report notes that the history of quiet title actions “goes back to the Courts of England,” and provided as examples “a plaintiff whose title to land was continually being subjected to litigation in the law courts,” and “one who feared that an outstanding deed or other interest might cause a claim to be presented in the future.” H. R. Rep. No. 92-1559, p. 6 (1972). From top to bottom, these reports show that Congress thought itself to be authorizing bread- and-butter quiet title actions, in which a plaintiff asserts a right, title, or interest of his own in disputed land.

 In a related vein, the dissent argues that our holding will undermine the QTA’s “Indian lands” exception by allowing adverse claimants to file APA complaints concealing their ownership interests or to recruit third parties to bring suit on their behalf. See post, at 236-238. But we think that concern more imaginary than real. We have trouble conceiving of a plausible APA suit that omits mention of an adverse claimant’s interest in property yet somehow leads to relief recognizing that very interest.

 For this reason, the Band’s statement that Patchak is “not an Indian or tribal official seeking land” and does not “claim an interest in advancing tribal development,” Brief for Tribal Petitioner 42, is beside the point. The question is not whether § 465 seeks to benefit Patchak; everyone can agree it does not. The question is instead, as the Band’s and the Government’s main argument acknowledges, whether issues of land use (arguably) fall within § 465’s scope—because if they do, a neighbor complaining about such use may sue to enforce the statute’s limits. See infra this page and 226-227.