**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| HAVASUPAI TRIBE, *Plaintiff-Appellant*, and GRAND CANYON TRUST; CENTER FOR BIOLOGICAL DIVERSITY; SIERRA CLUB, *Plaintiffs*, v. HEATHER PROVENCIO, Forest Supervisor, Kaibab National Forest; UNITED STATES FOREST SERVICE, an agency in the U.S. Department of Agriculture, *Defendants-Appellees*, ENERGY FUELS RESOURCES (USA), INC.; EFR ARIZONA STRIP LLC, *Intervenor-Defendants-Appellees*. | No. 15-15754 D.C. No. 3:13-cv-08045-DGC |

GRAND CANYON TRUST;
CENTER FOR BIOLOGICAL
DIVERSITY; SIERRA CLUB,
          *Plaintiffs-Appellants*,

          and

HAVASUPAI TRIBE,
                    *Plaintiff*,

          v.

HEATHER PROVENCIO, Forest
Supervisor, Kaibab National
Forest; UNITED STATES FOREST
SERVICE, an agency in the U.S.
Department of Agriculture,
          *Defendants-Appellees*,

ENERGY FUELS RESOURCES
(USA), INC.; EFR ARIZONA
STRIP LLC,
          *Intervenor-Defendants-*
                    *Appellees.*

No. 15-15857

D.C. No.
3:13-cv-08045-DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted December 15, 2016
San Francisco, California

Filed December 12, 2017

Before: Marsha S. Berzon and Mary H. Murguia, Circuit Judges, and Frederic Block, District Judge.*

Opinion by Judge Block

## SUMMARY**

### Mining Claims

The panel affirmed the district court's decision rejecting challenges by the Havasupai Tribe and three environmental groups to the determination of the United States Forest Service that Energy Resources (USA), Inc., and EFR Arizona Strip LLC, had a valid existing right to operate a uranium mine on land within a withdrawal area of public lands around Grand Canyon National Park that the Secretary of the Interior withdrew from new mining claims.

In 1988, the Forest Service approved a plan to build and operate the Canyon Mine, a uranium mine in the area around Red Butte. Red Butte, a site of religious and cultural significance to the Tribe, is within the Kaibab National Forest and the withdrawal area. On April 18, 2012, the Forest Service issued a "Mineral Report" and concluded that Energy

---

* The Honorable Frederic Block, United States District Judge for the Eastern District of New York, sitting by designation.

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Fuel had valid existing rights that were established prior to the Secretary's withdrawal decision.

As a threshold issue, the panel held that the Mineral Report was a final agency action.

The panel held that the Mineral Report was a "major federal action" under the National Environmental Policy Act ("NEPA"). The panel held that the district court correctly held that *Center for Biological Diversity v. Salazar*, 706 F.3d 1085 (9th Cir. 2013), not *Pit River Tribe v. U.S. Forest Service*, 469 F.3d 768 (9th Cir. 2006), governed this case. The panel further held that the original approval of the mining plan of operations was a major federal action, that action was complete when the plan was approved, and resumed operation of Canyon Mine did not require any additional government action. The panel concluded that the environmental impact statement prepared in 1988 satisfied NEPA.

The National Historic Preservation Act of 1966 requires consultation pursuant to section 106 prior to any "undertaking." The panel held that the Mineral Report approved an "undertaking" under the Act. The panel agreed with the district court that the Mineral Report did not permit, license, or approve resumed operations at Canyon Mine, it simply acknowledged the continued vitality of the original approval of the plan of operations. The panel concluded that the original approval was the only "undertaking" requiring consultation under the Act.

Finally, the panel held that the appellant environmental groups did not have prudential standing to challenge the

Mineral Report under either the Federal Land Policy and Management Act of 1976 or the General Mining Act of 1872.

## COUNSEL

Richard W. Hughes (argued) and Reed C. Bienvenu, Rothstein Donatelli Hughes Dahlstrom Schoenburg & Bienvenu LLP, Santa Fe, New Mexico, for Plaintiff-Appellant Havasupai Tribe.

Neil Levine (argued) and Aaron Paul, Grand Canyon Trust, Denver, Colorado; Marc Fink, Center for Biological Diversity, Duluth, Minnesota; Roger Flynn, Western Mining Action Project, Lyons, Colorado; for Plaintiffs-Appellants Grand Canyon Trust, Center for Biological Diversity, and Sierra Club.

Thekla Hansen-Young (argued), Jared S. Pettinato, Michael T. Gray, and Andrew C. Mergen, Attorneys; John C. Cruden, Assistant Attorney General; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; Nicholas L. Pino and Pamela P. Henderson, Office of General Counsel, United States Department of Agriculture; for Defendants-Appellees.

David J. DePippo (argued), Hunton & Williams LLP, Richmond, Virginia; Michael K. Kennedy and Bradley J. Glass, Gallagher & Kennedy P.A., Phoenix, Arizona; for Intervenor-Defendants-Appellees.

**OPINION**

BLOCK, District Judge:

In *National Mining Association v. Zinke*, _____ F.3d _____ (9th Cir. 2017), decided today, we upheld the decision of the Secretary of the Interior to withdraw, for twenty years, more than one million acres of public lands around Grand Canyon National Park from new mining claims.  That withdrawal did not extinguish "valid existing rights."  In these consolidated appeals, we consider challenges by the Havasupai Tribe ("the Tribe") and three environmental groups—Grand Canyon Trust, Center for Biological Diversity and Sierra Club (collectively, "the Trust")—to the determination of the United States Forest Service (the "Forest Service") that Energy Fuels Resources (USA), Inc., and EFR Arizona Strip LLC (collectively, "Energy Fuels") had a valid existing right to operate a uranium mine on land within the withdrawal area.  As elaborated below, we affirm the district court's thorough and well-reasoned order rejecting those challenges.

**I**

Much of what we said in *National Mining Association* concerning the history of uranium mining in the area and the Secretary's withdrawal decision is also relevant here.  To that we add some additional background regarding the particular mine at issue in this case.

Grand Canyon National Park is bordered to the north and south by the Kaibab National Forest.  The southern portion of the forest—which is included in the withdrawal area—contains Red Butte, a site of religious and cultural significance to the Tribe.

In 1988, the Forest Service approved a plan to build and operate what became known as Canyon Mine, a 17.4-acre uranium mine in the area around Red Butte. During the approval process, the Forest Service prepared an Environmental Impact Statement ("EIS") pursuant to the National Environmental Policy Act of 1969 ("NEPA"). NEPA requires an EIS for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

At that time, the Forest Service also addressed the mine's impact under the National Historic Preservation Act of 1966 ("NHPA"). Section 106 of the NHPA requires federal agencies, prior to issuing a license for any "undertaking," to "take into account the effect of the undertaking on any [historic property]." Pub. L. No. 89-665, § 106 (codified, as amended, at 54 U.S.C. § 306108). Historic property is defined as "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register." 54 U.S.C. § 300308. Based on its review, the Forest Service required mitigation measures to minimize the impact on possible relics buried on the site of the mine. The review did not include nearby Red Butte because that site was not eligible for inclusion on the National Register until 1992. *See* National Historical Preservation Act Amendments of 1992, Pub. L. No. 102-575, tit. XL, § 4006 (making "[p]roperties of traditional religious and cultural importance to an Indian tribe" eligible for inclusion on the National Register). The EIS, however, did address the tribal religious significance of Red Butte.

The Tribe sought judicial review, but both the district court and this Court rejected the challenge. *See Havasupai Tribe v. United States*, 752 F. Supp. 1471 (D. Ariz. 1990),

*aff'd sub nom. Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991), *cert. denied*, 503 U.S. 959 (1992). The mine operator built surface facilities and sank the first fifty feet of a 1,400-foot shaft, but placed the mine on "standby" status in 1992 due to the unfavorable conditions in the uranium market that we described in *National Mining Association*.

As noted, the Secretary's withdrawal decision was "subject to valid existing rights." 77 Fed. Reg. 2563 (Jan. 18, 2012). A few months before the decision became final, Energy Fuels—which had become Canyon Mine's owner— notified the Forest Service that it intended to return the mine to active operations. At the Service's request, Energy Fuels agreed not to resume sinking the mineshaft pending review of its claim of existing rights.

On April 18, 2012, the Forest Service issued a "Mineral Report." It found that Energy Fuels' predecessors-in-interest had "located" mining claims at the site in 1978 and "discovered" uranium ore there between 1978 and 1982. It further found that there were 84,207 tons of uranium ore on the site, and that "under present economic conditions, the uranium deposit on the claims could be mined, removed, transported, milled and marketed at a profit." Based on those findings, the Forest Service concluded that Energy Fuel had "valid existing rights that were established prior to the mineral withdrawal."

The Forest Service also reviewed its 1988 decision, including its EIS and the mine's approved plan of operations ("PoO"), "for any changes in laws, policies or regulations that might require additional federal actions to be taken before operations resume." In a "Mine Review" dated June 25, 2012, it concluded that the existing PoO was "still in effect

and no amendment or modification to the PoO is required before Canyon Mine resumes operations under the approved PoO." It further concluded that "[n]o new federal action subject to further NEPA analysis is required for resumption of operations of the Canyon Mine."

With respect to historic preservation, the Mine Review concluded that "there will be no new federal undertakings subject to NHPA Section 106 compliance." It noted, however, that Red Butte had become eligible for inclusion on the National Register, and opined that the site "could be considered a newly 'discovered' historic property." Applying the regulation applicable to such discoveries, 36 C.F.R. § 800.13(b)(3), the Forest Service immediately contacted the Tribe to "enter into government-to-government consultation" to "develop 'actions' to resolve or minimize the adverse effects" on Red Butte. In response, the Tribe insisted on a revised PoO, a supplemental EIS and a full consultation under section 106 of the NHPA. The Forest Service and the Tribe continued to correspond, but never settled on a specific plan of action. The Mine Review alludes to the likely reason: "Tribes have commented that most anticipated impacts, including the most serious impacts, cannot be mitigated if uranium mining is conducted at the Canyon Mine site."

Consultation with the Tribe ended in March 2013, when the Tribe and the Trust jointly filed suit against the Forest Service in the district court. Energy Fuels intervened as a defendant.

As amended, the complaint asserted four claims under the Administrative Procedure Act ("APA"):

1.  the Forest Service's determination that Energy Fuels had valid existing rights to operate the Canyon Mine notwithstanding the January 2012 withdrawal was a "major federal action significantly affecting the environment," and, therefore, the service violated the NEPA by not preparing an EIS in connection with its determination;

2.  the Forest Service's determination was an "undertaking," and, therefore, the service violated the NHPA by not conducting a full consultation under section 106 in connection with its determination;

3.  alternatively, the Forest Service violated the NHPA by not properly updating its original section 106 analysis to account for the impact on Red Butte; and

4.  the Forest Service violated several federal laws by failing to take various costs into account in its determination that Canyon Mine could be operated at a profit.

As relief, the plaintiffs sought a declaration that the Forest Service was acting in violation of the NEPA, the NHPA and other laws; an order setting aside any "approvals or authorizations" for operations at Canyon Mine; and an injunction prohibiting "any further uranium exploration or mining-related activities at the Canyon Mine unless and until the Forest Service fully complies with all applicable laws."

The parties cross-moved for summary judgment. In an order dated April 7, 2015, the district court held (1) that the plaintiffs had Article III standing, (2) that the plaintiffs lacked prudential standing with respect to their fourth claim, and (3) that the Mineral Report—which the district court referred

to as the "VER [Valid Existing Rights] Determination"—was a final agency action subject to review under the APA. *See Grand Canyon Tr. v. Williams*, 98 F. Supp. 3d 1044, 1055–61 (D. Ariz. 2015). Turning to the merits, the district court held (1) that the Mineral Report was not a "major federal action" requiring an EIS under the NEPA; (2) that the report was not an "undertaking" requiring a full section 106 consultation under the NHPA; (3) that the Forest Service's decision to consider the effect on Red Butte under 36 C.F.R. § 800.13(b)(3) was reasonable; and (4) that the Forest Service had complied with that regulation. *See id.* at 1062–73.[1]

Both the Tribe and the Trust timely appealed.

## II

The Forest Service argues that we lack jurisdiction because its determination that Energy Fuels has valid existing rights was not a final agency action. *See Ukiah Valley Med. Ctr. v. FTC.*, 911 F.2d 261, 266 (9th Cir. 1990) ("'[F]inal agency action' is a jurisdictional requirement imposed by [5 U.S.C. § 704].").[2] We review this threshold issue de novo.

---

[1] The district court also rejected the defendants' argument that two of the plaintiffs' claims were barred by collateral estoppel. *See Grand Canyon Tr.*, 98 F. Supp. 3d at 1061–62. That ruling has not been challenged on appeal.

[2] The Supreme Court recently reminded courts that "[o]nly Congress may determine a lower federal court's subject-matter jurisdiction." *Hamer v. Neighborhood Hous. Servs. of Chi.*, No. 16-658, at 1 (U.S. Nov. 8, 2017) (quoting *Kontrick v. Ryan*, 540 U.S. 443, 456 (2004)). Since the final agency action requirement is statutory, *Hamer* does not call into question its status as a jurisdictional limitation.

*See Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 247 (3d Cir. 2011).**[3]**

"'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. § 551(13). "[R]elief," in turn, includes the "recognition of a claim, right, immunity, privilege, exemption, or exception." *Id.* § 551(11)(B).

The Forest Service claims that it has no authority to recognize mining rights, and that the Mineral Report represents only the agency's "opinion" as to their validity. But whether or not the Mineral Report was legally required, it was prepared. Its conclusion that Energy Fuels had valid existing rights at the time of the withdrawal falls within the plain meaning of "recognition of a claim."

We further conclude that the Mineral Report was final. "As a general matter, two conditions must be satisfied for

---

**[3]** In the district court, the Forest Service further argued that the plaintiffs lacked Article III standing. It has not pursued that argument on appeal, but we are satisfied that the plaintiffs have suffered injuries in fact that are fairly traceable to the Service's actions and that could be redressed by a favorable judicial determination. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Continued uranium mining at Canyon Mine causes concrete injury to the Tribe's religious and cultural interests and the Trust's aesthetic and recreational interests. While the parties dispute whether continued mining required the Forest Service's approval, we must assume that it did in assessing standing. *See Equity Lifestyle Props., Inc. v. Cty. of San Luis Obispo*, 548 F.3d 1184, 1189 n.10 (9th Cir. 2008) ("The jurisdictional question of standing precedes, and does not require, analysis of the merits."). If the Tribe and Trust are correct that continued mining required approval, then their injuries are fairly traceable to that approval and could be redressed by setting it aside.

agency action to be 'final[.]'" *Bennett v. Spear*, 520 U.S. 154, 177 (1997). "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* at 177–78 (citation and internal quotation marks omitted). It is true that the final decision to *contest* a claim of existing rights rests with the Department of the Interior's Bureau of Land Management ("BLM"). *See Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 336 (1963). If, however, the Forest Service finds a claim is valid, nothing else happens. The district court sensibly described that outcome as "the Forest Service's 'last word' on the validity of the Canyon Mine mineral rights," *Grand Canyon Tr. v. Williams*, 38 F. Supp. 3d 1073, 1078 (D. Ariz. 2014), and we agree with that description.

In addition, to be final, "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotation marks omitted). Rights to a mineral deposit on public land are not *conferred* by agency action; they are acquired by the miner's own actions of location and discovery. *See American Law of Mining* § 4.11 (2d ed. 1997) ("[The prospector] may seek 'valuable minerals' and, if he finds them, may initiate a vested right without the approval of anyone else, including representatives of the government that owns the land."). Nevertheless, the Mineral Report *determined* that such rights existed with respect to Canyon Mine, and that is all *Bennett* requires.

We have observed that "courts consider whether the practical effects of an agency's decision make it a final agency action, regardless of how it is labeled." *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094–95

(9th Cir. 2014).  We therefore focus on both the "practical and legal effects of the agency action," and define the finality requirement "in a pragmatic and flexible manner."  *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (citations omitted).  We agree with the district court's assessment that the Mineral Report was a practical requirement to the continued operation of Canyon Mine because  "the Forest Service, Energy Fuels, and interested tribes all understood that mine operations would not resume until the VER Determination was completed."  *Grand Canyon Tr.*, 38 F. Supp. 3d at 1079.

## III

The challenges to the merits of the district court's judgment raise three issues: (A) Was the Mineral Report a "major federal action" under the NEPA? (B) Did the Mineral Report approve an "undertaking" under the NHPA? (C) Did the Trust have prudential standing to challenge the Mineral Report under either the  Federal Land Policy and Management Act of 1976 ("FLPMA") or the General Mining Act of 1872 ("Mining Act")?  Our review of each question is de novo.  *See N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 845 (9th Cir. 2007) (compliance with NEPA and NHPA on summary judgment); *Mills v. United States*, 742 F.3d 400, 406 (9th Cir. 2014) (prudential standing).

## A.  NEPA

We have held that "where a proposed federal action would not change the status quo, an EIS is not necessary." *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 235 (9th Cir. 1990).  Nor is an EIS necessary to "discuss the environmental effects of mere continued

operation of a facility." *Burbank Anti-Noise Grp. v. Goldschmidt*, 623 F.2d 115, 116 (9th Cir. 1980). We applied those general principles in *Center for Biological Diversity v. Salazar*, 706 F.3d 1085 (9th Cir. 2013) ("*CBD*").

At issue in *CBD* was the resumption of mining at a uranium mine, "after a seventeen-year hiatus, under a plan of operations that BLM approved in 1988." 706 F. 3d at 1088. We held that "no regulation requires approval of a new plan of operations before regular mining activities may recommence following a temporary closure." *Id.* at 1093. We further held that the original approval of the plan was a major federal action, but that "that action [wa]s completed when the plan [wa]s approved." *Id.* at 1095 (quoting, with alterations, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 73 (2004)). By contrast, in *Pit River Tribe v. United States Forest Service*, 469 F.3d 768 (9th Cir. 2006), we held that a lease extension was a major federal action that altered the status quo because without it, the lessee would not have been able to continue operating a power plant on the leased property. *See id.* at 784.

The district court correctly held that *CBD*, not *Pit River*, governs this case. As in *CBD*, the original approval of the plan of operations was a major federal action. And as in *CBD*, that action was complete when the plan was approved. Unlike *Pit River*, resumed operation of Canyon Mine did not require any additional government action. Therefore, the EIS prepared in 1988 satisfied the NEPA.

## B. NHPA

As we explained, the NHPA requires consultation pursuant to section 106 prior to any "undertaking." 54 U.S.C.

§ 306108.  As pertinent here, "'undertaking' means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including . . . those requiring a Federal permit, license, or approval[.]" *Id.* § 300320(3).  Here, too, we agree with the district court that the Mineral Report did not "permit, license, or approv[e]" resumed operations at Canyon Mine; it simply acknowledged the continued vitality of the original approval of the PoO.  Just as that approval was the only "major federal action" requiring an EIS under the NEPA, it was the only "undertaking" requiring consultation under the NHPA.

The Tribe concedes that the approval process in 1986 included the necessary consultation, and that the cultural and religious impacts on Red Butte were not included because they were not required to be at that time.  It argues, however, that the NHPA imposes a continuing obligation on federal agencies to address the impact on historic property at any stage of an undertaking.

The statutory definition of "undertaking" dates from 1992.  Prior to that, it was defined by the Advisory Council on Historic Preservation ("ACHP"), the agency charged with implementing the NHPA, to include "continuing projects, activities, or programs and any of their elements not previously considered under section 106."   36 C.F.R. § 800.2(o) (1991).  But that definition was superseded by 54 U.S.C. § 300320(3), which omits the reference to continuing projects. The regulatory definition now conforms to the statutory definition.  *See* 36 C.F.R. § 800.16(y).  We therefore disagree with the Tribe that the current definition of "undertaking" encompasses a continuing obligation to evaluate previously approved projects.

Although continuing obligations have been removed from the definition of "undertaking," they remain in 36 C.F.R. § 800.13(b):

> If historic properties are discovered or unanticipated effects on historic properties found after the agency official has completed the section 106 process . . . , the agency official shall make reasonable efforts to avoid, minimize or mitigate adverse effects to such properties and:
>
> (1) If the agency official has not approved the undertaking or if construction on an approved undertaking has not commenced, consult to resolve adverse effects pursuant to § 800.6; or . . .
>
> (3) If the agency official has approved the undertaking and construction has commenced, determine actions that the agency official can take to resolve adverse effects, and notify the [state or tribal historical office], any Indian tribe . . . that might attach religious and cultural significance to the affected property, and the [Advisory Council on Historic Preservation] within 48 hours of the discovery. The notification shall describe the agency official's assessment of National Register eligibility of the property and proposed actions to resolve the adverse effects. The . . . Indian tribe . . . and the Council shall respond within 48 hours of the notification. The agency official shall take

> into account their recommendations regarding
> National Register eligibility and proposed
> actions, and then carry out appropriate
> actions. The agency official shall provide the
> . . . Indian tribe . . . and the Council a report of
> the actions when they are completed.

As noted, the Forest Service concluded that this regulation applied to Canyon Mine. It further concluded that subsection (3) applied because construction had begun in the early 1990s, although it acknowledged that the 20-year hiatus presented a "somewhat unusual situation."

The Tribe objects that Red Butte was not a newly discovered historic property—and that the effect of operating a uranium mine near it was not unanticipated—because it had informed the Forest Service of the religious and cultural significance of this site decades earlier. While that is true, the Tribe does not dispute that Red Butte was not a "historic property" eligible for inclusion on the National Register until 2010. As a result, the NHPA did not obligate the Forest Service to take the site into account when it conducted a full section 106 consultation in 1986. And while we agree that eligibility for inclusion on the National Register is not exactly a "discovery," there is no other regulation requiring an agency to consider the impact on newly eligible sites after an undertaking is approved. In other words, by invoking § 800.13(b), the Forest Service may have given the Tribe more than it was entitled to demand.

The Tribe further argues that *if* § 800.13(b) applies, the Forest Service should have proceeded under § 800.13(b)(1), instead of § 800.13(b)(3). In sum, the agency must engage in a full section 106 consultation if it "has not [yet] approved the

undertaking or if construction on an approved undertaking has not [yet] commenced." 36 C.F.R. § 800.13(b)(1). If, however, the agency "has approved the undertaking and construction has commenced," it can engage in a simplified process to "determine actions that the agency official can take to resolve adverse effects." *Id.* § 800.13(b)(3).

Canyon Mine fits squarely within the scope of subsection (3). The mine was approved in 1988, and construction of the surface facilities began shortly thereafter. The Tribe argues that subsection (3) was intended to address emergency situations, but there is no express limitation to such situations.[4]

Finally, the Tribe briefly argues that the Forest Service did not comply with § 800.13(b)(3). Having reviewed the record, we conclude that the Forest Service made a good-faith effort to ascertain steps it could take to resolve the possible adverse effects of mining on Red Butte. If that effort was not successful, it is because the Tribe insisted on a full consultation under section 106, which was not legally

---

[4] In a letter to the Forest Service, the ACHP opined that subsection (3) applies "where construction activities have begun and would be ongoing, and thus, the agency had limited time and opportunity for consultation." Normally, an agency's interpretation of its own ambiguous regulation is "controlling unless plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks omitted). Subsection (3) is not ambiguous. Moreover, the letter was motivated by a concern that proceeding under subsection (3) "would continue the unproductive conflict between the Forest Service and the Indian tribes that consider Red Butte a sacred place." We agree with the district court that the letter "appears to be more tactical advice than an interpretation of the regulation." *Grand Canyon Tr.*, 98 F. Supp. 3d at 1070.

required, and a complete ban on mining around Red Butte, which the Forest Service lacks the authority to impose.

## C. FLPMA and Mining Act

The plaintiffs' fourth claim, advanced by the Trust, challenged the merits of the Forest Service's conclusion that Energy Fuels had valid existing rights predating the withdrawal because (1) its predecessors-in-interest had discovered uranium ore on the site of Canyon Mine, and (2) the deposit "could be mined, removed, transported, milled and marketed at a profit." The district court did not address this claim, instead holding that the Trust lacked prudential standing to make it. *See Grand Canyon Tr.*, 98 F. Supp. 3d at 1058–60. We agree.

The APA imposes "a prudential standing requirement in addition to the requirement, imposed by Article III of the Constitution, that the plaintiff have suffered an injury in fact." *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998). Thus, "a person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v . Patchak*, 567 U.S. 209, 224 (2012) (internal quotation marks omitted).[5] On appeal, the Trust argues that its interests fall

---

[5] Both the Trust and the Forest Service believe that the Supreme Court reframed the zone-of-interests inquiry from a question of prudential standing to one that asks "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014). But *Lexmark*

within the zone of interests protected by the FLMPA and the Mining Act.

We described the FLMPA at length in *National Mining Association*. The withdrawal authority conferred by the statute can be exercised "in order to maintain other public values." 43 U.S.C. § 1702(j). The Trust argues that that phrase is broad enough to cover the environmental interests it seeks to vindicate. While we agree that the FLMPA allows the Secretary to take environmental concerns into account, it does not define any standards by which to judge an assessment of those factors. *Cf. Heckler v. Chaney*, 470 U.S. 821, 830 (1985) ("[R]eview is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."). Moreover, the central issue in this case is not the FLPMA's broad grant of withdrawal authority to the Secretary of the Interior, but its requirement that any withdrawal must be "subject to valid existing rights." 43 U.S.C. § 1701 note. The FLPMA does not define what those rights are or how they are determined. Those questions are answered by the Mining Act.

The Mining Act confers rights based on the existence of "valuable mineral deposits." 30 U.S.C. § 22. It does not, however, define "valuable." In 1894, the Secretary of the

---

was not an APA case. *See id.* at 1395 ("To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations."). Less than two years earlier, the Supreme Court continued to describe the question as one of prudential standing in the APA context. *See Match-E-Be-Nash-She-Wish*, 567 U.S. at 212 ("The second [question] is whether Patchak has prudential standing to challenge the Secretary's acquisition.").

Interior adopted a "prudent man test," which required mineral deposits to be "of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine."  *United States v. Coleman*, 390 U.S. 599, 602 (1968) (internal quotation marks omitted). The Supreme Court endorsed that test in 1905.  *See Chrisman v. Miller*, 197 U.S. 313, 322 (1905).  In 1956, the Secretary of the Interior modified the "prudent man test" to include a "marketability" component, which asks whether the mineral can be "extracted, removed and marketed at a profit." *Coleman*, 390 U.S. at 600 (internal quotation marks omitted). Once again, the Supreme Court endorsed the Secretary's test. *See id.* at 602 ("[The marketability test] is a logical complement to the 'prudent-man test' which the Secretary has been using to interpret the mining laws since 1894.").

The interests served by the Mining Act in general, and the prudent man and marketability tests in particular, are frankly economic.  "The obvious intent" of the Act, the Supreme Court has said, "was to reward and encourage the discovery of minerals that are valuable in an economic sense." *Id.*  At its core, then, the Mining Act confers rights on those who have an economically defined interest in extracting a resource from public lands.

By defining that right, however, the Act also at least arguably protects the interests of others with competing claims: rival prospectors, of course, but also the United States, which holds title to the land and can authorize others to use it for other purposes to the extent it does not interfere with mining.  *See United States v. Curtis-Nev. Mines, Inc.*, 611 F.2d 1277, 1283 (9th Cir. 1980) (purpose of the Multiple Use Act of 1955 was to "limit the exclusive possession of

mining claimants so as to permit the multiple use of the surface resources of the claims . . . so long as that use did not materially interfere with prospecting or mining operations").

At bottom, the Mining Act protects those with competing interests in public land that are, or are akin to, property rights. The environmental interests of the Trust are protected by the NEPA, just as the cultural and religious interests of the Tribe are protected by the NHPA. Since, however, those interests do not derive from anything like a property right, they are outside the Mining Act's zone of interests. As the district court aptly reasoned, "'The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions.' This case presents the same situation in reverse[.]" *Grand Canyon Tr.*, 98 F. Supp. 3d at 1059 (quoting *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993)). As a result, the Tribe and Trust lack prudential standing to claim violations of the Mining Act.

## IV

The judgment of the district court is **AFFIRMED**.